R E C E I V E D
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SEP 1 6 2022

FILED
DOCKETED _____ DATE _____ IN

Robert A. Eaton
Appellant(s),

9th Cir. Case No. ~~0:22-35840~~ 22-35480

vs.

District Court or
BAP Case No. 1:18-cv-00065

Montana Silversmiths
Appellee(s).

**APPELLANT'S INFORMAL OPENING BRIEF**

*(attach additional sheets as necessary, up to a total of 50 pages including this form)*

**JURISDICTION.** This information helps the court determine if it can review your case.

1.  Timeliness of Appeal:

    a.  What is the date of the judgment or order that you want this court to review? March 1, 2021 (Doc. 110); September 28, 2021 (Doc. 113) November 1, 2021 (Doc. 118); February 1, 2022 (Doc. 131/132); May 25, 2022

    b.  Did you file any motion, other than for fees and costs, after the judgment (Doc. 157/158) was entered? Answer (yes) or no: _____
    NOTE: February 19, 2021 (Doc. 109) Eaton requested a hearing.
    *   If you did, on what date did you file the motion? October 12, 2021 (Doc. 114) October 26, 2021 (Doc. 116); November 9, 2021 (Doc. 120); November 23, 2021 (Doc. 117)
    *   For prisoners or detainees, what date did you give the motion to prison authorities for mailing? _____N/A_____ June 16, 2022
    *   What date did the district court or bankruptcy appellate panel (BAP) decide the motion that you filed after judgment? May 25, 2022? Doc. 159 Notice of Appeal June 23, 2022

    c.  What date did you file your notice of appeal? June 16, 2022 → June 23, 2022 Addendum to Appeal Notice
    *   For prisoners or detainees, what date did you give your notice of appeal to prison authorities for mailing? _____N/A_____

9th Cir. Case No. _O: 22-35480_                                    Page 2

**FACTS.** Include all facts that the court needs to know to decide your case.

2.    What are the facts of your case?

Plaintiff (Appellant) Robert Eaton obtained a Bachelor of Fine arts degree in Metalsmithing from Montana State University on May 5, 2000. Eaton was hired by Montana Silversmiths on or about May 13, 2013. Eaton was hired to be a designer/Engraver at Montana Silversmiths. During his employment, Eaton Completed performance reviews with Montana Silversmiths On July 29, 2015, Eaton met with Colette Schlehuber, Human Resources at Montana Silversmiths, to discuss issues he perceived in the engraving department at Montana Silversmiths. These issues included Eaton observing what he perceived as racial discrimination and sexual harassment by his direct Supervisor, Justin Deacon. Eaton requested these issues be looked into but wanted it Kept confidential. Colette stated that this would be difficult, but she would investigate. Colette never investigated and this was noted in her deposition. Eaton Continued to observe issues with his direct supervisor related to sexual/racial harassment the next 2 years, going to several VPs and the CEO with no help. On April 4, 2017 Eaton had his annual performance review with his direct supervisor, Justin Deacon. There were downgraded marks, including stating that Eaton "side-steps proper reporting concerns outside management hierarchy" and the second Comment "Robert will not acknowledge Travis's (Deacons son who works in same department) existence ... while getting along well with Rick and Brian" (others in department). On the evening of April 4th, Eaton met with Lance Neirby, VP of operations. During this meeting Eaton's performance review and Eaton's concerns about racial/sexual harassment were discussed. On April 5th Eaton met with his direct supervisor, Justin Deacon, and Lance Neirby to discuss his performance review and Eaton's issues with sexual and racial harassment that were brought up the night before. Eaton was sent home on April 5th after going back to work following the meeting for the remainder of the week. On April 5th, Eaton wrote a grievance letter and sent it to Montana Silversmiths. Eaton did not come back on April 10, 2017. Went on Work Comp leave

Case: 22-35480, 06/21/2022, ID: 12475447, DktEntry: 1-3, Page 46 of 55

9th Cir. Case No. 0:22-35480                                  Page 3

**PROCEEDINGS BEFORE THE DISTRICT COURT OR THE BAP.** In this section, we ask you about what happened before you filed your notice of appeal with this court.

3.   What did you ask the district court or the BAP to do—for example, did you ask the court to award money damages, issue an injunction, or provide some other type of relief? (Original complaint was $120,000) Amended Complaints were:

\* Compensate for Violation of Rights Under Title VII

\* Compensatory damages - Including lost wages, past/future and/or impairment of power to earn money, physical pain, emotional distress and humiliation - past and future; past/future medical expenses

\* Punitive Damages

\* Permanent Injunction against future acts of Discrimination and harassment against Plaintiff by Montana Silversmiths.

\* Trial by Jury and all issues triable

\* Cost and expenses here in including court, attorney fees, pre judgement and Post judgement costs/interest. Any and all other relief to which he may be entitled

4.   What legal claim or claims did you raise in the district court or at the BAP?
     1. Retaliation
        - Wrongful termination (WDEA)
     2. Disability Discrimination
     3. FMLA
     4. Age Discrimination
     5. Hostile Work Environment
     6. Defamation

5.   **Exhaustion of Administrative Remedies.** For prisoners, did you use up all administrative remedies for each claim before you filed your complaint in the district court? If you did not, please tell us why. Yes.

Case: 22-35480, 06/21/2022, ID: 12475447, DktEntry: 1-3, Page 47 of 55

9th Cir. Case No. 0:22-35480                                      Page 4

**PROCEEDINGS BEFORE THE COURT OF APPEALS.** In this section, we ask
you about issues related to this case before the court of appeals and any previous
cases you have had in this court.

6.    What issues are you asking the court to review in this case? What do you
      think the district court or the BAP did wrong?

1) Did the District Court Err as a matter of law by not allowing a Hearing
   per Eaton's request which he is allowed (when requested) for summary
   judgement and was requested within the 14 day window per MCA 56(2)(A)?

2) Did the Court Err in their understanding and use of (Eaton's) Affidavits,
   Declarations, and Exhibits allowed under Rule 56(c)(4) providing that
   a formal affidavit or a written ~~sworn~~ unsworn declaration (Eaton's notes
   which were documented within Montana Silversmith's place of business)
   that complies with 28 U.S.C. §1746 can be used to support or oppose a
   motion for summary judgment.

3) Did the District Court Err in changing their decision in Doc. 113 regarding
   Eaton's downgraded performance review(s) and the causal connection with ~~Eaton's~~
   Complaints - reversing their decision about timing of sexual/racial harassment
   and adverse actions made, including sent home and laid off

7.    Did you present all issues listed in Question 6 to the district court or the BAP? [Continued.]
      Answer yes or no: _____

      If not, why not?     Yes

Case: 22-35480, 06/21/2022, ID: 12475447, DktEntry: 1-3, Page 48 of 55

9th Cir. Case No. _0:22-35480_          Page 5

8.  What law supports these issues on appeal? (You may refer to cases and statutes, but you are not required to do so.)

28 U.S.C. 1291
28 U.S.C. 1331 and 1332
28 U.S.C. 1367(a)
28 U.S.C. 1732', 28 U.S.C. 1746
29 U.S.C. 623 ; 29 U.S.C. 621-634
42 U.S.C. 2000 et seq.
42 U.S.C. 12102 (1)
42 U.S.C. 623

Fed. R. Civ. P. 56
Fed. R. Civ. P. 4(a)

Employer Guide to Family Medical Leave Act - Wage
    and Hour Division of the United States Dep. Labor 1993

How to Analyze Data For Age Discrimination in Layoff
    Situations - Richard E. Biddle (1992).

Hostetter v. College of Wooster (2018). ; Toll v. Carroll Touch (1992
O'connell, (2019) ; Conley v. Gibson ; Diaz v. Eagle
    NWADA (2019
Bowers v. Bernard (1984)
Buck v. Billings Montana Chevrolet (1991)
Fraser v. Goodale (9th Cir. 2006)
Faragher v. Boca Raton (1998)
James v. Booz-Allen & Hamilton, Inc (4th Circ., 2004)
Colonial Sur. Co. v. Millennium Century Const.
Polo Grounds at Melville, LLC v. William J. Sneider Rev.

Case: 22-35480, 06/21/2022, ID: 12475447, DktEntry: 1-3, Page 49 of 55

9th Cir. Case No.  0: 22 - 35480                                            Page 6

9.     **Other Pending Cases.** Do you have any other cases pending in the court of
       appeals? If so, give the name and docket number of each case.  NO

10.    **Previous Cases.** Have you filed any previous cases that the court of appeals
       has decided? If so, give the name and docket number of each case.  NO

Robert A. Eaton
Name
113 Moose Track Dr.
Roberts, MT  59070

Address

Signature

9/12/22

Date

Jurisdictional Statement

Jurisdiction lay in the District Court which entered summary judgment pursuant to Fed. R. Civ. P. 56 in this cause of action for disability discrimination under 42 U.S.C.§12102(1), 12112, 1201 *et. seq.*, age discrimination under 29 U.S.C § 623, discrimination and retaliation for protected activity under Title VII of the Civil Rights Act of 1964, 42 U.S.C §2000 *et. seq.*, with the United States District Court having jurisdiction over the Underlying claims pursuant 28 U.S.C § 1331, 1332, and 1367(a) ("Overall, other claims that so relate"). These are the basis for its subject matter jurisdiction.

Jurisdiction lies in this Circuit Court, for this is an appeal from a final decision of the United States District Court for the District of Montana. 28 U.S.C §1291. *Eaton v. Montana Silversmiths* (D. Mont. 2022), Civil case no. 1:18-cv-00065-SPW. The District Court completed a decision against Eaton, disposing of all Eaton's claims, leaving no claims pending at the District Court level. Pursuant to Fed. R. Civ. P 4(a), this appeal is timely as the Order granting Montana Silversmiths ("MTS") Motion(s) for summary judgment and the District Court's Judgment were entered on May 25th, 2022 at Docket no. 157 (Order Granting Summary Judgment) and no. 158 (Clerk's Judgment). Eaton Filed a Notice of Appeal on June 16, 2022 at Docket 159.

Statement of the Issues Presented For Review (Continued from page 4)

1. Did the District Court Erred as a matter of law in allowing Montana Silversmiths counsel to Strike Document 114 without following L.R. 7.1(c)(1) and not addressing issues brought forth to the court in Document 116.

2. Did the District Court Erred as a matter of law in allowing a second summary judgment for the Defendants (Montana Silversmiths) when they had already been allowed one summary judgment and the second summary judgment request came over 1 year past the closure of discovery, which is not allowed per the law with no additional facts or defense given, not looking at Eaton's admissible evidence and making assertions and inferences that were not based on fact, but theory.

3. Did the judge (District Court) erred with regard to abuse of Discretion, allowing unreasonable requests without weighing the evidence. Erred as a matter of factual law by making "Factual findings that were against the weight of the evidence" by not allowing Doc. 114 and by-STATEMENT OF FACTS VERSUS STATEMENT OF OPINION(ignored evidence provided by plaintiff and used/mimicked phrases by the opposing counsel with no true evidence)- The judge applied less weight to the facts than to the hearsay of the defendant's inconsistent responses of only 2 of the 6 witnesses, weighting piecemeal responses of two witnesses depositions and not looking at the whole responses and inconsistency in their responses, and not looking at the evidence and facts

provided by the plaintiff, which were documents rendered at the time of the complaints and not by two witnesses which the defense/Court knew the Plaintiff was going to impeach.

4. Given a preponderance of triable issues of material fact, did the District Court also erred in the summary dismissal of Eaton's separate and independent claim alleged under the Montana Wrongful Discharge from Employment Act ("WDEA") for the defendant-Montana Silversmiths having failed to comply with provisions of its personnel policy in connection with his impending discharge?

5. Did the District Court Err in not evaluating Eaton's continuous requests to review not being allowed FMLA leave (brought up before the statute of limitations) when he qualified, because he did not put it under the correct caption- Even though Eaton had put this in his original complaints and throughout the entire case- which is his civil right?

6. Did the District Court Misconstrue the law regarding timing of Eaton's complaint and lay off associated with retaliation, discrimination, wrongful termination. The District Court Stated there was a triable issue due to timing (Doc. 113), then changed this after the second summary judgment (Doc. 157).[1]

7. Did the District Judge err in not initiating self recusal due to pro se litigant bias.

---

[1] There is a Causal Connection with timing of the Complaint and the court saw this in the first summary judgment decision about timing of sexual/racial harassment complaints made by Eaton and the adverse actions made, including sending Eaton home after the April 5th meeting, and ultimately laying Eaton off.

8. Did the District Court err in Allowing Jessica Fehr, former lawyer for Moultan and Bellingham (now a District Judge) to defame Eaton's character in the MHRB investigation while she was a lawyer against Eaton in his case, by saying in a document that "Eaton said he was going to bring a gun", which was never stated by anyone at Montana Silversmiths.

9. Did the District Court err in their perspective on what exactly is a "legitimate business reason?"

## Procedural Chronology

On April 4, 2018, Eaton filed his initial complaint against Montana Silversmiths (*Eaton v Montana Silversmiths* Docket # 2). In Eaton's Second Amended Complaint, filed on October 19, 2018 (Docket#12) Eaton asserted that he had been subjected to disability discrimination, age discrimination, hostile work environment, defemation, retaliation, and wrongful termination in violation of Title VII which included not allowing Eaton FMLA leave while on work comp-following Eaton reporting a public policy violation regarding observation of his director engaging in sexual harassment and racial discrimination during his time at Montana Silversmiths. Montana Silversmiths Counsel put in a Motion to Dismiss Pursuant Rule 12(b)(1)and 12 (b)(6) on November 9, 2018 (Docket #16,17). On November 18, 2018 the Court order Consent to the jurisdiction of the

US Magistrate Judge "having been either withheld or met with objection, this case remains assigned to Honorable Susan P. Watters and is REFERRED to the Honorable Timothy J. Cavan. Eaton filed a Reply Brief to Montana Silversmiths Request for Dismissal on December 11, 2018 (Docket #24). Magistrate Judge Timothy Cavaan filed recommendations to dismiss all counts except Retaliation and Wrongful termination on July 12, 2019 (Docket #28) is Order adopting findings filed on August 6, 2019 (Docket #29), order rescinded secondary to not mailing Eaton July 12, 2019 Recommendations, then again re adopting findings on September 10, 2019 (Docket #33) with leave to amend. Eaton filed a third Amended complaint on September 27, 2019 (Docket #34) with Montana Silversmiths answering amended complaint on October 10, 2019 (Docket # 35). Pretrial conference was completed on December 3, 2019 (Docket #43) with amended pleadings and Eaton filed a fourth amended complaint of January 10, 2020 adding Breach of Contract, which included FMLA complaints within the new claim of breach of contract count number 7. Montana Silversmiths moved for dismissal of 4th Amended Complaint on January 24, 2020 (Docket #54). On August 3rd, 2020 Magistrate Judge Cavaan put in Findings and recommendations re54 Motion to Dismiss Partial Rule 12 (b)(6) filed by Montana Silversmiths requesting dismissal of Count VII of the 4th Amended complaint, but not of the Counts III-VI that Eaton had been allowed leave to amend (Docket #79). Eaton

filed an objection to dismissal of Count VII of Breach of Contract on August 18, 2020 (Docket 80). After several months of discovery, Montana Silversmiths moved for Summary Judgment on December 3, 2020 -without giving EAton their taxes #49, request for financial statement of taxes(Docket #94). Eaton filed his response on January 4, 2021. Eaton filed a request for a hearing on motions for Summary Judgment, stating, " Oral argument would be helpful to the court in deciding the Motions for Summary Judgment, which involve important and complex issues of law and fact" (Docket #109). On September 28, 2021, The Court denied Summary Judgment with respect to Eaton's performance evaluation and Granted summary Judgment on all other remaining claims. (Docket #113). This order was labeled "Magistrate Judge and Order". Eaton filed an objection to the order on October 12, 2021 (Docket #114). Montana Silversmiths filed a Motion to Strike Document 114 and Request for Clarification from the Court on October 14, 2021 (Doc. 115). Eaton filed a response to Montana Silversmiths Motion to Strike and Request for Clarification of the order from the Court (Doc. 116). Within Eaton's Response, Eaton requested allowance time and ability to complete a request for reconsideration if the court were to Strike Eaton's Document 114, allowance of time to file an interlocutory appeal, and request to look at Eaton's request for hearing and other issues individually(i.e. Discovery Request for Montana Silversmiths taxes) named within that document. The Court

clarified the order and denied Eaton Motion for Reconsideration, as well as did not respond to Eaton's Hearing request consideration. (Doc. 118) on November 1, 2021. Eaton filed a Motion to Certify Interlocutory Appeal of Courts Order Document 113 (Counts 2-6) on November 9, 2021. Montana Silversmiths Filed their Response to Eaton's Motion to Certify on November 24, 2021 (Doc. 125). The court Put in a Scheduling order for pretrial conference on December 9, 2021 (Doc. 126). Montana Silversmiths counsel filed a Motion for leave to file a Second Summary Judgment on December 21, 2021 (Doc. 127,128). Eaton filed his response to Montana Silversmith's request on January 3, 2022. The Court Denied Eaton's request for Interlocutory Appeal (Doc. 131) and Granted Montana Silversmiths request for motion for leave to file a Second Summary Judgment (Doc. 132) both on February 2, 2022. Motion In Limine were filed by both parties on February 28, 2022. Montana Silversmiths filed a Second Motion for Summary Judgment with supporting Briefs on March 1, 2022 (Doc. 137-139). Eaton filed his response to Montana Silversmiths section MOTION for summary Judgment on March 22, 2022 (Doc. 142-143). THe Court filed the ORDER Granting a Second Summary Judgment with no remaining issues in Controversy on May, 25, 2022 and Clerk's Judgment was also entered that day (Doc. 157-158). Eaton filed a timely Notice of Appeal on June 21, 2022 with a Notice Of Appeal Addendum filed on June 23, 2022.

Undisputed Facts relied upon by the District Court for entry of summary judgment for Montana Silversmiths and against Eaton (Cited in part- from Court's Review of the Case in Document 113)

This Court reviews *de novo* (and *plenary*) the decision by the District Court beginning with the Court's assessment of the undisputed facts that provided the basis for the entry(s) of summary judgment. (Continuation from page 2 of the hand written portion of this document)...

.. within Eaton's performance evaluation on April 4th, 2017, Eaton was also found to significantly exceed expectations in the area of being a "[s]elf starter, shows resourcefulness,' for which Deacon commented that he was a 'very hard worker, always on task." (*Id*) In sum, Eaton's total appraisal grade was 2.70, placing between the ratings for 'Exceeds Expectations" (2.0) and "Meets Expectations" (3.0).(Id at 8; 105-10 at 36). Eaton disputes that the negative ratings were warranted. He points out that Deacon did not want to include the comments relative to Travis. It was included at the insistence of Lance Neirby, Montana Silversmiths' Vice President of Operations-who was a new hire (See Doc. 105-4 at 43; 28:17-21; at 44:29:7-17; at 53:65:19-66:22)

Additionally, the criticism of Eaton "sidestepping" proper reporting channels appears to be contrary to Montana Silversmiths' employee handbook. The 2015

Employee Handbook directs individuals with a complaint to 'discuss their concerns with their immediate supervisor, Human Resources or any member of management" (Doc. 105-8 at 8). The handbook also "has a policy that encourages any employee to speak to their supervisor, manager or human resource personnel at any time for any reason." (*Id.* at 21).

Eaton met with Neirby later in the day on April 4th, 2017 to discuss the evaluation and other issues in the workplace.(Docs. 41at ¶8;96-4 at 2; 105-10 at 39). During the meeting, Eaton raised several issues, included nepotism, sexual harassment, and racial discrimination (*Id*).

The next day, April 5, Neirby, Deacon, and Eaton met to discuss the performance review and the issues Eaton raised the previous day. (Doc. 105 at ¶15). During the meeting, after Neirby had Eaton bring up his concerns with sexual harassment and racial discrimination by Eaton, Neirby changed the language of the evaluation in the category of '[i]nteraction with coworkers" from focusing on 'Travis' to state that '[ch]allenging relationship exists between employee and direct supervisor." (Doc. 96-3 at 9). Thus, the criticism shifted from a co-employee to Eaton's relationship with his supervisor, Justin Deacon. The rating for that category remained at the lowest possible rating. The revised performance evaluation also deleted a comment in the original evaluation, which read "Robert will not acknowledge Travis's existence" (Doc. 96-3 at 8, 10). As well as deleting the

comment "While getting along with Rick and Brian"(The other workers in the department)

By all accounts, the April 5, 2017 meeting was contentious. Eaton went back to his desk, following the meeting. Lance Neirby stayed behind with Deacon in his office. Lance Neirby went to Eaton later and told him he had to go home. Eaton met with Schlehuber from human resources following the meeting. Eaton relayed that he felt as though he was being retaliated against for these complaints, and stated he was going to go home and call his lawyer and the EEOC. (Doc. 96-5) Schlehuber advised Eaton he was not being retaliated against, and instead fashioned his temporary dismissal as "a time for adjustment and time for him to think about how we all need to work together going forward." *Id.*

Eaton went home on April 5 as directed and composed a "grievance complaint." (Docs. 96-6; 105-7 at 5-8) He hand delivered the grievance on April 10, the day he returned to work after being sent home (Doc. 105 at ¶ 27.) The grievance detailed Eaton's view of the April 5th meeting, including the changes to his performance evaluation, nepotism and preferential treatment between Justin and Travis Deacon (among others), and his belief that the criticism for sidestepping proper reporting channels was contrary to the process laid out in the employee handbook (Doc. 96-6 at 1-2).

Eight days later, after Eaton submitted his grievance, Neirby then sent an email to Schlehuber on April 13 "to further document points of concern during the discussion between Robert, [Deacon] and myself outlined in my Wednesday April 5th email." (Docs 96-4 at 1; 105-10 at 41.) Neirby added negative characterizations to the account of the April 5th meeting with Eaton. The same day, April 13, Montana Silversmiths hired Associated Employers of Montana ("AEM") to investigate the allegations contained in Eaton's grievance letter. (Docs. 41 at ¶ 13; 105 at ¶ 28).

Shortly after returning to work, Eaton took scheduled medical leave on April 14, 2017 for carpal tunnel release surgery for a work related injury. ( Docs. 41 at ¶ 14; 105 at ¶ 42) Schlehuber and Eaton Subsequently exchanged communications regarding his return to work post-surgery. These communications included Eaton requesting information and FMLA leave requests, which Eaton was denied.

On June 1, Schlehuber memorialized a phone call with Eaton, in which it was noted that Eaton's physician had updated his medical status, extending his leave until June 12. (Doc. 105-12At 8,9).

On June 9, Montana Silversmiths issued a letter to Eaton regarding his return to work and AEM's report of his grievances (Doc. 96 at ¶ 29). Prior to his return to work, however, Eaton's employment with Montana Silversmiths was terminated on June 15, 2017. Montana Silversmiths contends that Eaton's termination was a part

of the third phase of the reduction-in-force slated for June 2017. (Id. at ¶¶ 51-52).
Montana Silversmiths argues that underpinning the restructuring and cost-savings
plan was the anticipated loss of a sponsorship agreement with the American
Quarter Horse Association ("AQHA") Eaton rejects this as an underpinning
assumption, stating that Montana Silversmiths was unaware of this as an issue until
September, 2017 two months after his layoff.  (*Id.*)

Among the criteria for termination in manufacturing were skills and
cross-training, performance evaluations, disciplinary actions, and value for future
business. (Doc. 105 at ¶ 51.) Montana Silversmiths state that Eaton "comparatively
lacked internal cross training for different tasks and positions….compared to other
members of the Design/Engraving department," and that Eaton "only cross trained
in the "Design Fab' areas of 'sawing' and 'stone setting', as well as 'Custom
Buckle Engraving'." (Doc. 96 at ¶ 53) In support, Montana Silversmiths proffers
the cross-training matrix, which shows Eaton with the lowest score of the staff.
(Doc. 96-9 at 13). Eaton disputes this assertion with the deposition of Justin
Deacon, who acknowledged that Eaton also "did some…stippling' and 'soldering'
and Eaton also proffers his degree in metalsmithing to support his qualifications
(Doc. 105 at ¶ 53; See Doc. 96-21 at 6: 19:15-18, 20:4-8). Eaton further contends
the matrix is not accurate.[2]

---

[2] Again, here there are references to the documentation that supported Eaton's argument of invalid
matrix, however, due to clerical error  the judge could not see this. However, if the Judge was confused
and not sure, a hearing that Eaton requested could have easily cleared up any confusions.

Eaton subsequently filed a complaint with the Montana Human rights Bureau (MHRB) on July 12, alleging retaliation. (*Id*. at ¶ 67; see Doc. 96-12)modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), against Montana Silversmiths, Inc. ("Montana Silversmiths") . Eaton amended his complaint on Novermber 12, adding claims of age and disability discrimination (Id; see Doc. 96-13). MHRB issued its report on January 8, 2018. On March 20, 2018, the EEOC adopted the MHRB findings. Eaton then filed the instant suit on April 4, 2018. Eaton contended in the lawsuit that Montana Silversmiths retaliated against Eaton by lowering his performance evaluation marks on the April 4th, 2017 evaluation (which was used to lay off Eaton), and by sending him home after the April 5th, 2017 meeting,  Eaton claims that Montana Silversmiths retaliated against him after he engaged in a protected activity.  This included making complaints of sexual and racial harassment by his direct supervisor, Justin Deacon, through providing low marks and negative comments on his annual evaluation.

Eaton also claims that Montana Silversmiths retaliated against him for filing a grievance regarding his harassment complaints by terminating his employment in June 2017 as part of a company-wide layoff while Eaton was on workers' compensation leave, with the allowance of FMLA,  and using Eaton's performance evaluation for this justification.

## Summary of the Argument

It should be considered and reviewed with judicial notice, that Eaton's facts and evidence were so overlooked during review of the documented evidence provided. Additionally, due to clerical errors in putting in Eaton's "Exhibit list" during the first summary judgment, the court did not see the Exhibits that were presented by Eaton on Exhibit page three, thus ⅓ of Eaton's Exhibits were overlooked due to not being referenced in the Exhibit list that was provided to the court, but somehow not scanned into the Pacermonitor system. Because Eaton did not have access to "Pacermonitor", he was unaware that the Court had scanned in his document with one page of the exhibit list not showing up in the scanning process, possibly stuck to another piece of paper? Eaton noticed this when he purchased access to Pacermonitor (not Pacer by the Court) during the second summary judgment. Eaton tried to clarify this in Doc. 142 and included an Attachment #6, which appears (in the system Eaton uses) to have been scanned into the body of Document 142, instead of scanned in as an attachment). Therefore, when Eaton requested a hearing, objected to the "Magistrate Findings and order" and attempted to request reconsiderations and interlocutory appeal to clarify his information, all were rejected, however, the defense was allowed a second summary judgment over a year after closure of discovery- even though, according to FRCP 56, Montana Silversmiths is not allowed a Summary Judgment affordance for more than 1

month past the close of discovery. Especially when there were no additional facts provided in Montana Silversmiths' second summary judgment, only expanding on developing a negative description of Eaton's character, which is not substantiated any admissible evidence, by any documented disciplinary actions, documented disciplinary documents, nor described by anyone in Eaton's department as an accurate description-in addition to using 'judicial economy' for The Court to drop Eaton's case. The facts of the case with the actual evidence shows Eaton has a triable case, if a neutral party were to evaluate the information and evidence provided and review all documents and evidence thoroughly and allow Eaton to speak his side of the case with the associated evidence, it would show a triable issue that the judge is not allowed to drop prior to trial. The Court did not address the facts Eaton presented in his case, did not exercise Eaton's right to a hearing to clarify when Eaton had provided all the evidence, but it wasn't put in for the Court to see accurately, especially the second summary judgment when the judge did not review the information and facts Eaton recorded, showing probable prejudice to the pro se litigant in this case.

## ARGUMENT

1. The District Court Erred as a matter of law by not allowing a Hearing per Eaton's Request, which he is allowed -when requested - for summary judgment and was requested within the 14 day window per Montana Code Annotated 56

(2)(A). (Especially when disputes exist and there is any confusion within the Court).

According to the Pacermonitor filings of Case 1:18-cv-00065 SPW, *Eaton v. Montana Silversmiths* (2022), Document 108 (REPLY to Response to Motion re94 MOTION for Summary Judgment (Rule 56) filed by Montana Silversmiths. (Warren, Adam) ) was Docketed on February 5th, 2021. His Request for a hearing was sent via mail and received by the Court on February 19, 2021[3], which was within the appropriate timing according to the Montana Code Annotated 56 (2)(A). Eaton's request for a hearing clarified "Oral argument would be helpful to the court in deciding the Motions for Summary Judgment, which involve important and complex issues of law and fact" (Doc. 109). This request was denied in Document 113 "Magistrate Judge and Order"[4], with the Judge stating, "Eaton's motions for extension and for hearing will be DENIED." Further explaining this as, "Eaton has also requested a hearing on Montana Silversmiths request for summary judgment. The court has thoroughly reviewed the parties' submission on the summary judgment motion and has determined that it would not benefit from oral argument". However, in Doc. 114, Eaton objected to the Court's denial of Eaton's Hearing request, stating, "Per MCA 56 2(A) The right to a hearing is waived unless a party requests a hearing within 14 days after the time for filing a reply brief has

---

[3] (also had 3 more days for paper filing)
[4] This was later clarified in Doc.

expired." Eaton had requested a hearing for his defense regarding Montana Silversmiths' Motion for Summary Judgement within 14 day after the time for filing a brief had expired, therefore he retained his right to a hearing. Eaton respectfully requests review of this document (Doc. 114-1) in light of hearing denial." The defense requested Striking of this Document in Document 115, requesting a clarification of The Judges "Magistrate Judge and Order" (Doc. 113). Eaton Attempted several times to state he was not allowed a hearing and would like The Court to consider this (Docs. 114, 116, 120, and 125 of *Eaton v. Montana Silversmiths, 2022*). The Court, instead ignores Eaton's request for a Hearing noted in Document 109. The Court further denies that this request was noted in Docs. 114, 116, and 120 and, instead, The Court states in the Order Denying request for Interlocutory appeal the following statement: "The Plaintiff's voluminous briefing is confusing and sites inapplicable statutes as well as makes new requests and claims such as a complaint about not receiving a hearing on the summary judgment motion, which are far afield from the motion."(Doc. 131) Eaton had made several attempts to get the court to just look at his evidence and citations, as well as applicable laws throughout the case as was met with opinions, which appeared biased and went against the facts and evidence of the case. Most responses from the Court appeared Boilerplated with phrases used in exact replica as phrases used by the Defense without any actual evidence to back this up.

"Confusion" became the most used word by the Defense and The Court in allowing a second Summary Judgment, however, a hearing could have clarified any confusions, but Eaton was not allowed this right.

2.  The Court erred in the area of not assessing Eaton's Disability Claim under the ADAAA 2008 status as should have been, thus denying him the right to be heard according to law (Judicial Code of Conduct Cannon #3).

Request for appeal revolves around the foregoing explanation of a controlling question of law. The court's summary judgment order (Document 113) states that Eaton could not show that he had a disability.

All parties and the Court have referred to ADA act of 1964; however, Eaton had not seen amended information in the ADAAA, which was not brought forth during arguments in summary judgment. The ADA Amendments Act of 2008 (ADAAA) went into effect on January 1, 2009. The five changes to the ADA are significant and provide exception to materially different facts which were originally argued in the Summary Judgment. Amendments to the act include that: 1)The definition of the ADA "disability" must be both more 'flexible" and "broadly construed"; 2)It expands the list of "major life activities"; 3)It provides that courts can no longer consider whether "mitigating measures," such as medication or assistive technology, reduce the impact of impairment on an individual; It states that diseases that are "episodic" or in remission may still be "disabilities"; 4) It provides that employees who claim they are 'regarded as' disabiled can now make an ADA claim, even if the 'perceived' disability does not impact a major life activity.

In enacting this updated law, Congress instructed that it should be interpreted to favor "broad coverage of Individuals under the ADA," and that courts must focus

not on whether an employee is 'disabled'but on whether the "employer is complying with its obligations under the law'.

Therefore, even though Eaton can prove that he had a history of impairments and is provided evidence to substantiate this, and Montana Silversmiths were aware, this should not be the focus of this section. The focus should be whether the employer is complying with its obligations under the law". *Nunes v. HIE Holdings, Inc., 2018*

"Disability" includes any impairment that is episodic or in remission if it would substantially limit a major life activity when active: and (Jan 1, 2009). To prove disability, Eaton must prove the following: 1) He was a "Qualified Individual with a Disability"; 2)Montana Silversmiths knew about his disability; 3) Eaton has a record of disability; 4) Montana Silversmiths took an employment action against EAton because he had a disability, or a record of a disability; 5)Montana Silversmiths denied Eaton reasonable accomodations, after Eaton let them know there were accomodations needed going back to work.

A. Eaton was a 'Qualified Individual with a Disability". Please refer to All medical notes in (Doc. 120-1). These medical notes show that Eaton injured his back 5/2/01 while lifting a tire onto a drilling rig. He underwent 3 back surgeries in 2007, including a spinal fusion L5-S1 and spondylothesis, and spinal stenosis, and completed a Maximum Medical Improvement Assessment on 11/17/08(MTS5879-5891), at which time Dr. Lawrence Splitter summarized that Eaton's pain affected his ability to "sit and stand, lift overhead, grasp objects or reach for things, lift objects from the floor, bend, stoop, or squat, and his ability to walk or run". Thus showing under ADAAA "a record of physical impairment that substantially limited a major

life activity" qualifies for disability. Even if Eaton did not have this, he is not required to present evidence that the employer believed Eaton was substantially limited in major life activities. *Nunes v. HIE Holdings, Inc., 2018*[5]

B. Montana Silversmiths knew about Eaton's back injury and disability (Colette Dep Doc. 96-19 at 14:14-22). Colette acknowledged that Eaton's recovery from his carpal tunnel surgery was taking longer than anticipated(Doc 105 pg. 69 with noted evidence Ex. Ex 9, Ex 16, Ex. 43--**PLTF 1613, Eaton Affidavit (Doc. 103-1 ast #72,Colette memo MTS 42&44; MTS 319-320)**

C. Eaton has a record of disability.  (Doc 104 #129)February 14, 2019, Eaton completed an Occupational Evaluation, in which the examiner stated, with his back issues and his hand issues, he cannot find a job, because it erodes the occupational base (**PLTF 98 2nd paragraph**).  This note, although 1 ½ years past Eaton's lay off shows ongoing issues with his two impairments. Per ADAAA, though, regulation requirements do not require that an impairment last a particular length of time to be substantially limiting, Eaton can show that his impairments were longstanding and limiting to all major life functions, when these issues are affecting Eaton's back and hands, which are tantamount to working in any job function.

D. Montana Silversmiths took an employment action against Eaton because he had a disability, or a record of a disability . Montana Silversmiths would not allow Eaton back to work after Eaton initiated the interactive process, which is a requirement by ADAAA which requires communication and good-faith

[5] "The appellate court held that the plaintiff was not required to present evidence that the employer *believed* that plaintiff was substantially limited in a major life activity. Instead, the plaintiff could simply show that the employer terminated plaintiff "because of" his knowledge of the shoulder pain, regardless of whether the employer actually perceived the shoulder pain as a disability, and The Ninth Circuit's expansion of the scope of the "regarded-as" disability definition follows decisions in the First, Fifth, Sixth and Tenth Circuits which similarly defined the definition under the ADAAA. Additionally, although the employer had argued that the ADAAA "regarded-as" disabled definition does not apply to "transitory and minor impairments," the appellate court noted that this exception is an affirmative defense with the burden of proof on the defendant, and not the plaintiff. The court held that the employer had not set forth evidence to establish plaintiff's shoulder pain was transitory and minor.Therefore, the appellate court held that Plaintiff had established a genuine issue of material fact as to whether the employer regarded him as having a disability.The Ninth Circuit further reversed the circuit court's holding that the plaintiff could not establish his shoulder pain was an actual disability. Specifically, the appellate court found that because plaintiff could neither work nor lift more than 25 pounds nor lift his arm above chest height without pain, he had identified two major life activities affected by his impairment. The court noted an impairment "need not prevent, or significantly or severely restrict the activity" in order to substantially affect a major life activity. Therefore, the court found an issue of fact as to whether the plaintiff had an actual disability."

exploration of possible accommodations. Instead of Colette engaging in good faith exploration, she refuses to engage in this conversation, stopping Eaton, saying he needed to obtain a work release form. She did not let Eaton know that Eaton's Work comp adjuster had contacted her via email on 5/11/17 (Doc. 120-1) to let her know that the doctor said that he would let Eaton come back to work when Eaton was ready and to let him know. Nor did she let Eaton know that The Doctor had not yet filled out a release form.

E. SIMILARLY SITUATED INDIVIDUAL: This includes a fellow employee of Eaton's. Rick Waltner, who was also an engraver and had recently had a type of hand surgery within months of Eaton's. Rick had stated in his deposition that Colette told him he could come back whenever he was ready. Additionally, Colette held back that she typically gets the medical release forms through/form work comp, as she had via a screenshot email for Rick Waltner( Doc. 120-1), who was told he could come back to work when he was ready (Doc 105 pg. 61 Ex. 6(Rick Deposition 30:24 through 31:9), not saying anything about a medical release form to him, showing disparate treatment. According to the United States Civil Rights Act of 1964, stating the similarly situated individuals that were not treated the same shows disparate impact.

F. FMLA entitlement and/or retaliation ties to the work comp. Being injured, Colette would not allow FMLA leave, which allowed them to lay me off while on work comp.*(Arban v. West Publishing Corp 345 F. 3d #90* (2003) Additionally, it is not necessary for a plaintiff to request appropriate relief, properly categorize legal theories, or point to any legal theory at all. *Toll v. Carroll Touch, Inc* 977 F2d 1129, 1134(7th Cir. 1992)(...complaint need not point to appropriate status or law to raise a claim for relief; complaint sufficiently states a claim even if it points to no legal theory or even if it

points to wrong legal theory, as long as 'relief is possible under any set of facts that could be established consistent with the allegations' (emphasis added). The party moving for dismissal must show "beyond doubt that the plaintiff can prove not set of facts ins support of his claim [that] would entitle him to relief" *Conley v. Gibson*, 355 U. S. 41, 45-46 (emphasis added).

Now, illnesses diagnosed as minor may qualify as FMLA protected, if they meet the incapacity and continuing treatment test after the certification period. For example with a hiatal hernia, normally a minor problem managed by antacid, was retroactively entitled to the FMLA leave because the employee saw a physician twice in a matter of a few days, thus satisfying the continuing treatment test. The eighth circuit later exhibited more generosity by suggesting that three day incapacity may occur at any time during the entire illness, even after termination of employment. The regulations promulgated under the FMLA states that employees eligibility is confirmed when the leave is requested, an employer may not challenge eligibility, further, if an employer fails to notify an employee of his ineligibility within two days of the leave request, the employee becomes eligible for the leave. However, Colette stated in her Deposition that Eaton Qualified. Additionally, the "Risk of Ignorance" that the FMLA may apply rests with the employers. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but only state that leave is needed (FMLA, R. 2012), which Eaton did in April, and Again on June 1st, 2017. Eaton may not have included FLMA entitlement as one of his counts because he thought FMLA was covered under ADA; however, he would like to use this as a showing of pretext in his lay off as well as disability discrimination, which may include liquidated damages under the Fair Labor Standards Act (*Chandler V. Specialty Tires of AM 283 F3d 818, 827 (6th Cir. 2002*).

Montana Silversmiths own Handbook stated that work comp will be designated at FMLA leave (Doc 105 Exhibit 25, MTS-191. pg 28).[6] MTS went against their own written policy in which they would not have been able to lay off Eaton if he was on FMLA leave.[7] Colette would not allow Eaton more time off with FMLA, nor would she allow him back to work, even though Eaton voiced concern over lost PTO and no more time off as well as ongoing emails between Work comp and Collete confirming Eaton's ongoing hand issues.[8]

<u>Eaton request does involve more than one controlling question of law:</u>

There are two of Eaton's counts that have specific questions of law: 1) Disability Discrimination; and 2) Wrongful termination with specific regards to legitimate business reason. These two issues, once shown that there is a controlling question of law lend to the supplemental jurisdiction claims. A controlling question of law is one in which either 1; if decided erroneously, would lead to reversal on appeal, or 2) is 'serious to the conduct of the litigation either practically or legally. (*Katz*, 496 F2.D at 755 (citations omitted). Saving the district court's time and the litigants expenses is a 'highly relevant factor'.

---

[6] MCA 39-2-904 which include "The employer materially violated an express provision of its own written personnel policy prior to the discharge, and the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer."

[7] This deprivation goes against the new WDEA, which expressly states that 'the employer materially violated an express provision of its own written personnel policy, which the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer.

[8] (Doc. 120-1) is Eaton's written documentation of the meeting June 1st, 2017 "My last pay stub was May 24th-June 7th. PTO was 32.30 on June 1st. Colette said with work comp, I would not receive short term disability. I'm not able to come back until the investigation is over. Colette said moving forward plays into my return to work with my hand and how they plan moving forward after the investigation." I said I need to return to work because of the PTO. I told her my doctor said I could call in to get a release form. She was very determined to have me stay off more for the sake of the investigation than my hand or the condition of my hand".

1. <u>Disability Discrimination–Controlling Question of Law.</u> It should be noted that a controlling question of law may be characterized on an appeal as a mixed question of Law and Fact. There is a likelihood of confusion under the Lanham Act "A question of fact, a question of law or both?" (Kentucky Law Journal, 73). As Eaton had previously argued in his interlocutory appeal request for certification in *Nunes v. Holdings, Inc.,* (2018), the appellate court held[9]

> Additionally, in *Ortega v. South Colorado Clinic, P.C.( Dist of Col. Jan 20. 2015),* The United States District Court for the District of Colorado narrowly interpreted the definition of 'disability' and excluded the condition that arguably satisfied the ADA's broad standards. The plaintiff was terminated from her position as a medical coder following her diagnosis of fibromyalgia and interstitial cystitis. She claimed that her illness and consequential symptoms such as blurred vision, chronic pain, and dizziness interfered with her ability to read, work, and sleep. The court's insistence on a detailed pleading from the plaintiff regarding the description of her limitations and a comparison to the general public conflicted with the ADAAA's purpose of alleviating the plaintiff's burden under the ADA. Flaws in the court's analysis included, under the ADAAA and subsequent regulations, an impairment can be substantially limiting if it is episodic, in remission, or temporary 42 U.S.C§12102(4)(D) "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active"

---

[9] " The plaintiff was not required to present evidence that the employer *believed* that plaintiff was substantially limited in a major life activity. Instead, the plaintiff could simply show that the employer terminated plaintiff "because of" his knowledge of the shoulder pain, regardless of whether the employer actually perceived the shoulder pain as a disability, and The Ninth Circuit's expansion of the scope of the "regarded-as" disability definition follows decisions in the First, Fifth, Sixth and Tenth Circuits which similarly defined the definition under the ADAAA. Additionally, although the employer had argued that the ADAAA "regarded-as" disabled definition does not apply to "transitory and minor impairments," the appellate court noted that this exception is an affirmative defense with the burden of proof on the defendant, and not the plaintiff. The court held that the employer had not set forth evidence to establish plaintiff's shoulder pain was transitory and minor.Therefore, the appellate court held that Plaintiff had established a genuine issue of material fact as to whether the employer regarded him as having a disability.The Ninth Circuit further reversed the circuit court's holding that the plaintiff could not establish his shoulder pain was an actual disability. Specifically, the appellate court found that because plaintiff could neither work nor lift more than 25 pounds nor lift his arm above chest height without pain, he had identified two major life activities affected by his impairment. The court noted an impairment "need not prevent, or significantly or severely restrict the activity" in order to substantially affect a major life activity. Therefore, the court found an issue of fact as to whether the plaintiff had an actual disability."

In *Toyota Motor Manufacturing, Kentucky, Inc v. Williams* 534 U.S. 184 (2002).

Congress explicitly repudiated the Supreme Court's analysis in *Toyota*.

Specifically, Congress found that the Supreme Court in Toyota "created an

inappropriately high level of limitation necessary to obtain coverage under the

ADA (Section 2(b)(5) of the amendment act). The plaintiff was required to

perform tasks that exacerbated her carpal tunnel syndrome.

The above cases show that there is a definite controlling question of law regarding

the interpretation of the ADAAA as well as several courts who have erred in this

instance. Eaton had a history of a back injury, which Collette, HR, was aware of.

Additionally, he had undergone one of two carpal tunnel surgeries, both of which

were work related from working at Montana Silversmiths, and both of which

Colette was aware of and was actively speaking to Robert Eaton's Workman's

Compensation adjuster regularly. The court has access to all the records in Eaton's

interlocutory appeal request as well as summary judgment papers that substantiate

this. Additionally, Eaton had completed one carpal tunnel surgery that was very

evident to be taking longer than expected, showing he was in a disabled category

with this and his back. Additionally, it was noted in Collette's letter to Eaton that

he was expected back to work at full time and she would not engage in the

interactive process to initiate any sort of accommodations.[10] In *Hostettler v. College of Wooster*, (2018), the judge ruled that working full time cannot be considered an essential job function, cautioning the consequences of allowing that requirement on all disabled employees. Thus, the controlling questions of law are evident in the newly adjusted ADAAA section of the ADA, showing that Eaton should not have the burden of proving he is disabled, especially because the defendants have already acknowledged his disabilities. But, the courts should be looking at the employer being at fault for not actively engaging in verbal interactions for accommodations, including FMLA, adjusted work hours, which were possibilities per Eaton's need for accommodations. Additionally, according to four other federal circuits, the Second Circuit recognized that the ADA could address hostile work environment claims. A judgment against Costco wholesale essentially 'eliminated any uncertainty' of hostile work environment claims under the ADA (O'Connell, 2019)(NWADA, 2019). The court concluded that a hostile work environment exists in an environment that is 'subjectively and objectively' abusive.[11]

Thus, Eaton can establish a prima facie case for Disability Discrimination and hostile work environment.

---

[10] Colette reported that she could not allow Eaton back to work at this time because the grievance and Eaton being off work for surgery go hand in hand, even though Eaton was off work for a work related injury (PLTF 1613, Eaton Affidavit #72,Colette memo MTS 42&44; MTS 319-320). She further explained that the grievance investigation may be done by June 12, 2017 and will give Montana Silversmiths time to get the results and then they could determine what "we all need to do to work together going forward".
[11] Supports Eaton's claim of hostile work environment

2. The Court Erred in not looking at the soluble, credible, and substantial evidence Eaton puts forth in his summary judgment responses, *Bowers v. Bernard (1984),The principal issue of the appeal is whether the superior court's findings of fact in favor of the defendant were supported by the evidence. As to this issue we are afforded little aid by the parties.* Thus, the Court's factual findings were against the weight of the evidence provided by Eaton. Eaton attempted several times to provide The Court with the evidence as well as providing an objection to Magistrate Judge and Order (Doc. 114 ), which again provided evidence that there was no legitimate business reason for Montana Silversmiths to lay Eaton off, in particular. The Court did not look at Eaton's evidence, which shows clearly that Eaton's position was one of the highly sought after positions that are the backbone of the company and always needed. In *Buck v. Billings Montana Chevrolet*, Inc (1991), 248 Mont. 276, 281-82, 811 P2d. 537, 540, "legitimate business reason" is defined as a "reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business". Eaton proved that there was no logical relationship between him being fired because it was more logical to keep Eaton for the needs of the business than to fire him, thus showing that firing him was because of other reasons(Doc 114 & 114-1; Doc. 143)..

3. The Court presented an "Abuse of Discretion" Where they would not allow Eaton to clarify information within the First Summary Judgment, which was unclear to the court due to a clerical error, which the Court did not scan in one of Eaton's pages that provided his Exhibit list. Eaton was unaware of this error until the Second Summary Judgment. Regardless, The Court would not allow Eaton to Object to the Findings and Clarify information (Doc. 114), but instead struck this document. They would not allow for Eaton a hearing to clarify information provided. They would not allow Eaton a Request for Reconsideration, or Interlocutory Appeal, even with Eaton providing additional information regarding newly identified evidence and bringing light to the Court that Eaton was unaware of ADAAA of 2008 and the Court did not use this in the analysis of Eatons Disability claim. Finally, according to the law, the parties are not allowed a summary judgment, yet alone a second summary judgment, especially when requested a month after Discovery closes. The Defendants requested a second summary judgment over a year past the close of discovery and provided no new evidence, just emphasized defamatory statements from the very 2 employees at Montana Silversmiths, Lance Neirby and Colette Schlehuber, which Eaton had planned on impeaching (Eaton stated his argument for this appeal in detail in his Motion In limine- Doc. 136 (in Eaton V. Montana

Silversmiths). The information that the Defendant's provided in the second summary judgment was only these two employee's responses in their depositions 3 years after the incident and only after the lawyers took a break during Eaton's depositions and conferred with the witnesses behind closed doors. The defendants did not use the emails that were sent the day of the said meetings by Lance and Collete and that corroborated with Eaton's own noted documented on those days. Instead, The Court did not look at the evidence that Eaton provided in his defense of not allowing a second summary judgment, and Eaton's defense to the summary judgment, in fact, The Court just restated what the Defendant's stated, saying the information was "confusing" of what Eaton said.

4. Did The Court Err in not addressing Eaton's ongoing requests for The Court to address EAton's claims of not being allowed FMLA leave or even being given the opportunity for FMLA leave when he went on work comp and had requested this.

Eaton mentioned not being allowed FMLA in his Fourth Amended Complaint (Doc. 48- Dated January 10, 2020- of Eaton v. Montana Silversmiths):

Montana Silversmiths employee handbook states,. **2) Use of Paid and Unpaid Leave(p.28 Montana Silversmith's Employee Handbook)[12], "Disability leave for the birth of a child and for an employee's serious health condition, including worker's compensation leave (to the extent that it qualifies), will be designated as FMLA**

_____

[12] Employee Handbook (Doc. 105-8 at 24-25) ;Employer Guide to Family Medical Leave Act-Wage and Hour Division of the United States Department of Labor (1993).

**leave and will run concurrently with FMLA".**-When Eaton asked HR, Colette Schlehuber, about FMLA , he was told because this was worker's compensation, he did not qualify, and would not provide him with a certification form to fill out, or request FMLA. Eaton asked 30 days before going on leave, as well as during leave when his PTO was running out. This shows that HR was not complying with their contract in the handbook, that shows that Eaton should have been allowed to at least submit an FMLA leave form request to assess whether he could obtain this in conjunction with Workers Compensation; however, HR did not allow him this right, by denying him the ability to apply for FMLA. Eaton was on Workers Compensation, not allowed FMLA, even with his need for extended leave.(***Evidence: Colette Deposition Doc. 96-19:54-57).***

Eaton provided evidence of this in his documents, but the court would not address his complaint, because Eaton unknowingly put it in the wrong subheading.

5. Does The Court hyperfocus on one miscited "New York Municipal Court" legal theory(Doc. 132) and not look at the totality of Eaton' s argument, which provided extensive citations that were appropriate with subsequent evidence?

6. Did the Court Err on taking the Defendants words as fact without supporting evidence (Doc. 157) and not look at tangible evidence Eaton provides (Doc. 103, 104, 105, 142, 143)and references, thus showing prejudice towards the 'blue collar' worker? During Montana Silversmiths brief, they stated "In submitting this Reply to the Court, Montana Silversmiths remained cognizant of the length restriction per L.R. 7.1(d)(2)(B), especially after the Court has already allowed the parties overlength briefs on this Motion. As such, Montana Silversmiths is unable to address every issue contained in the vast amount of material that Eaton has submitted for his opposition,2 but it

nonetheless presents the critical points below to further establish Montana

Silversmiths' basis for summary judgment. (Doc. 108) and did not address

the most important portion of the defense, thus was allowed a second

summary judgment??? This appears prejudice at the very least.

In Document 157, The Court makes broad statements about Eaton not providing

evidence, which he did. Then takes Montana Silversmith's statements as fact. For

Example, in Document 142 at pages 72-93 of *Eaton v. Montana Silversmiths* ,

Eaton reviews, in detail with supporting documents and depositions, how Lance

Neirby, who was in charge of looking at the performance evaluations for lay offs

changed Eaton's performance evaluation even though Deacon, Eaton's direct

supervisor, did not want to change and downgrade Eaton's marks. Then when

Eaton went to Lance about the downgraded marks on the evening of April 4, 2017,

(Eaton thinking Deacon downgradedhis marks, not Lance), Eaton stated he was

worried Deacon was trying to make Eaton look violent (this was documented by

Lance in an email (Doc. 105-10 at 39-40)and by Eaton in his documented

notes(Doc. 105-), and the issues of Eaton's concerns with his perceptions of

Deacon's racial discrimination and sexual harassment

7. Did the Court Err on admissibility/ allowance of information provided in

   Eaton's sworn formal affidavit that complied with 28 U.S.C §1746, which,

   According to FRCP56(c)(4), can be used to support or oppose a motion for

summary judgment. According to these rules, the affidavit must be sworn or subscribed to under penalty or perjury, be based on personal knowledge, present facts that are admissible in evidence, and demonstrate that the affiant or declarant is competent to testify about the matters stated. Eaton's Affidavit complies with all of the above notations (Doc. 103-2 in Eaton v. Montana Silversmiths, 2022). As the Ninth Circuit Court explained,"[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."

*Fraser v. Goodale*, 342 F. 3d 1032, 1036 (9th Cir. 2003).

In Document 113 of *Eaton v. Montana Silversmiths*, The Court makes clear that Eaton had met the prima facie case for retaliation with regards to Eaton's downgraded performance evaluation. In allowing Montana Silversmiths a Second Summary Judgment, the Court failed to look at Eaton's (Doc. 129) Response to Montana Silversmiths motion to file a Second Summary Judgment. When reviewed, the Court of Appeals will find that The Court's statement in Document 132, stating, "Plaintiff, in this response, references case law without attribution or citation, some apparently from New York Municipal Court and others with no references at all. This is directly in violation of District of Montana Local Civil Rule 1.5. Furthermore, the response contains several unhelpful parentheticals and is at least half attempting to have the Court reconsider previously dismissed claims", is not an accurate account of Eaton's Document 129, which does not state anything about his previous claims at that point in time. Instead, it refers to specifically the performance evaluations, in fact, here is a quip from the document (Doc. 129):

The United States Supreme Court has recognized that "adverse actions" are not limited to those actions which are economic or tangible. *See, Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule " if it cannot reasonably be met despite the diligence of the party seeking the extension,\." Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modifications. If that party was not diligent, the inquiry should end."

*Johnson v. Mammoth Recreations,* Inc.975. F.2d 604, 609 (9th Circuit 1992)(citations omitted). This is a commonly applied citation.

Eaton's performance evaluation has been disputed from the beginning in the AEM investigation, in MHRB investigation, questions is the deposition, and in the fourth amended complaint. I can't see diligence by the Defendants (Montana Silversmiths), only incompetence, negligence of response, if the shoe was on the other foot (i.e., pro se plaintiff) I would not get another stab at it. This should be looked at in the light most favorable to the non-moving party.

Eaton also documented a variety of legal theories that supported the use of performance evaluations being used in employer retaliation cases where it was used as part of the employer's reason for layoff. This included cases, such as "poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment. An evaluation merely causing a loss of prestige or status is not actionable." *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 377 (4th Cir. 2004); When a pattern of discriminatory conduct is alleged, specific

individual acts should be viewed as a whole, rather than as isolated incidents. *See,
Ross v. Douglas Cnty.,* 234 F.3d 391, 397 (8th Cir. 2000). With several others
listed within this document. Additionally, Eaton had brought up specific facts and
legal arguments, including, "*Polo Grounds at Melville, LLC v William J.
Schneider Revocable Living Trust*: "The rule is intended to deter the interposition
of successive motions for summary judgment in the guise of motions to renew
where the new material could have been submitted with the original motion."
Former Manhattan Commercial Division Justice Eileen Bransten made a similar
point in *Colonial Sur. Co. v Millennium Century Constr., Inc.* when quoting the
oft-cited precedential language: "Parties will not be permitted to make successive
fragmentary attacks upon a cause of action but must assert all available grounds
when moving for summary judgment."- referring to the general policy against
allowing multiple or successive motions for summary judgment.

1. Did The Court Err in not looking at Eaton's defense in Doc. 129, but instead
   nitpicking one of Eaton's citations, when there were several other
   citation/legal theories provided to look at/reference? Would this be in
   non-compliance of Rule 12(b)(6), the "complaint should not be dismissed
   merely because a plaintiff's allegations do not support the particular legal
   theory he advances, for the court is under a duty to examine the complaint to
   determine if the allegations provide for relief on any possible theory."
   *Bowers v. Hardwick*, 478 U.S. 186, 201 (1986). Additionally, it is not
   necessary for a plaintiff to request appropriate relief, properly categorize
   legal theories, or point to any legal theory at all. *Toll v. Carroll Touch, Inc*
   977 F2d 1129, 1134(7th Cir. 1992)(...complaint need not point to appropriate
   status or law to raise a claim for relief; complaint sufficiently states a claim
   even if it points to no legal theory or even if it points to wrong legal theory,

as long as 'relief is possible under any set of facts that could be established consistent with the allegations' (emphasis added). The party moving for dismissal must show "beyond doubt that the plaintiff can prove not set of facts ins support of his claim [that] would entitle him to relief" *Conley v. Gibson*, 355 U. S. 41, 45-46 (emphasis added).

1. Did the Court Err in not looking at the admissible evidence provided for Age Discrimination, which included documentation from Montana Silversmiths, a place of business, as well as AEM investigation another place of business, and a statistical analysis of Age Discrimination?[13]
ADEA 29 U.S.C §621-634 is the Age Discrimination in Employment Act, a primary federal law, which prohibits employers from discriminating against employees who are at least 40 years old based on age.

Eaton was discriminated against based on his age secondary to the following (with associated evidence).

To make a prima facie case for age discrimination, Eaton must prove the following:

1. The employee, at the time of the act alleged to be discriminatory, is 40 or older. Eaton was age 43 when he was laid off.

2. The employee is qualified for their job position; Eaton showed with a preponderance of evidence that he was qualified for their job position. (Doc 105)

3. The employee experiences an adverse employment action. Eaton was laid off in June, 2017.

---

[13] *How to Analyze Data for Age Discrimination in Lay off Situations*-Richard E. Biddle (1992)

Andrew and Travis were half of Eaton's age and were both brought into the department to train. Eaton assisted both on various levels of metalsmithing[14]. Eaton only needs prove that he was either placed by substantially younger employees with equal or inferior qualification or discharged under circumstances otherwise giving rise to an inference of age discrimination (*Diaz v. Eagle, 521 F.3d 1201 2008*).

An inference of discrimination can be established by showing the employer had a continuing need for [the employees] skills and services in that their various duties were still be performed .. or by showing that others not in their protected class were bein treated favorably (*Diaz v. Eagle, 2008*). Eaton showed that Travis (Deacon's son) was provided opportunities that Eaton was not with trips[15], training[16]. Additionally, Eaton was needed, noted in the amount of overtime[17] used after Eaton's lay off as well as MTS attempting to hire someone after his lay off (Doc 105 pg. 83), but the young man didn't show a good skill set like Eaton. In the AEM investigation, it stated Montana Silversmiths wanted to hire younger engravers (Doc. 103-1; Eaton Affidavit #51&52;Doc. 105-7 at 15-25; MTS 62-72).The above coupled with Eaton's statistical analysis (Doc 113, pg34), form a prima face case for age discrimination.

---

[14] Eaton assisted in teaching Andrew and Travis how to saw and engrave.

[15] Rick Waltner's Deposition 29:8-11; Curt Robbins Deposition 32:2-22

[16] Doc 105 Ex. 5 (Justin Dep 17:25; 18:1-4)

[17] Doc 105 pg 75-78- All overtime of engravers was tripled or quadrupled after Eaton's lay off.. Travis's overtime increased from 70.03 before Eaton's Lay off to 140.03 after Eaton's lay off.

1. Did The Court Err in not addressing or acknowledging Eaton's direct evidence per 28 U.S.C §1732?

During the Eaton's defenses to Montana Silversmiths 1st and 2nd requests for Summary Judgment, he stated that he had direct evidence that precluded all defenses against legitimate business reason for laying Eaton off specifically, peticularily, for it would be easy to throw someone into a lay off, when they are in a protected class, if a company is getting rid of a person who is concerned about the Company going against their own personnel policies and has observed what they perceive as sexual/racial discrimination and harassment. Eaton, within his defense documents (*Eaton v. Montana Silversmiths* Docs. 103, 104, 105, 129, 142, 143), noted that in Justin Deacon's performance evaluation, Lance wrote, "Create a selection process for the next engraving candidate, implement new trainee program by July "(Dated April 3, 2017)(Doc. 105-6 at 41-42

In reference to the employment labor law, tangible consequences are referred to as "employment action is any action causing a significant change in your employment status. This includes, but is not limited to, hiring, firing".(employment labor law.com). Because the Layoff plan referred to in Eaton's 2017 layoff listed 5 areas that were used in the layoff (SUF #38), and the performance evaluations of 4/1/17 were listed in order as the second most weighted document to determine layoff, Then Eaton's tangible consequences were 1) downgraded marks on his

performance evaluation put in permanent file, to 2) Lay Eaton off. It should be noted that , "An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner*, LLC, 650 F3d 321, 337 (4th Cir. 2011( internal quotation marks omitted). Eaton's performance evaluation Marks were downgraded, noted to be incorrect, changed to a new performance record, which was again downgraded with new remarks which were not valid at the time of the original performance evaluation.[18]Lance was in charge of performance evaluations leading to layoff, so this was a definite pretext, showing retaliation for reporting public policy violations (Doc 105-13 at 9; MTS 1176; SDF# 36, 44-51).

## **STILL IN CONTROVERSY**

No legitimate business reason to lay Eaton off, specifically.

   a. Eaton met deadlines, according to 2017 Performance Evaluation (Doc. 105-10 at 37-38; PLTF 1730) Where Eaton scored a 2 for meeting deadlines, which is "exceeds expectations" On 2017 Evaluation (PLTF 1731) it states *"Robert is very artistic and works VERY hard putting his head down and focusing all the time which is much appreciated by management"*

   b. Overtime Hours of 2017, show that there was no reason to eliminate Eaton at that point in time.[19] Please review the following for the

---

[18] Eaton got along well with Justin Deacon before Lance made Eaton confront Deacon about his sexual harassment/racial discrimination claims on April 5th, 2017 (Doc. 142-SDF#45-46)

[19] (Doc. 105-13 at 36-104; Doc. 105-13 at 36-104; Doc. 105-13 at 36-104; MTS 4084-4088;; ) show that there was excessive overtime at the time of Eaton's lay off in June of 2017 in all areas he was able to cover (Doc. 105-13 at 52; MTS 1274-1344) Shows overtime hours added up

summary, refer to MTS 1274-1344 and **Doc. 105-13 at 52-104; Doc.**

**105-13 at 36-104; MTS 4084-4088** for fact checking:

| Name | Department | O.T. Jan-June 2017 | O.T. June, 2017 to July 2018 |
|---|---|---|---|
| Joseph Barker | Design/fab | 14.69 | 39.98 |
| Joe Horsley | | | 14.07 |
| Amie Braley | Design | 26.97 | 0.32 |
| Justin Deacon | Design | 53.94 | 125.15 |
| Travis Deacon | Design/Design Engraving | 17.03 | 140.08 |
| Robert Eaton | Design/Design Engraving | 7.24 | NONE ELIMINATED |
| Connie Henry | Design Fab | 62.51 | 137.38 |
| Curtis Iverson | Design Fab | 25.63 | NONE ELIMINATED |
| Greg Meier | Design Fab | 54.20 | 98.53 |
| Peggy Morgan | Design Fab | 63.65 | 174.50 |
| Kathy Skeman | Design Fab/ Design | 61.85 | Not provided |
| Brian Strecker | Design/Design Engraving | 10.49 | 31.25 |
| Shane Tjaaland | Design Fab/ buckle prod/ buffing | 26.43 | 87.55 |

---

from 1/1/17 through 6/15/17 total in design/engraving department 430 hours of overtime for 6 months. Now, if we were to compare the hours each individual engraver had from January, 2017-June, 2017 to the amount they had after Eaton's lay off from June, 2017 through July, 2018, it shows there was more individual overtime accrued by each engraver as well as in design department after Eaton's layoff.

| Rick Waltner | Design/Design Engraving | 5.38 | 37.93 |
|---|---|---|---|
| Cody Schlehuber | Design | Not provided | 122.42 |
| Tyler Phillips | Buffing | Not provided | 50.25 |
| Mark Ketola | Buffing/Grinding | No o.t noted until 1/19/18 | 118.70 |
| Nathan Brewster | Buffing/Grinding | Not provided | 211.40 |
| Lanny Conat | Buffing/Grinding | Not provided | 254.50 |
| Andrew Wells | Buffing | Not provided | 84.98 |

In reference to the admissibility of evidence,

a) AQHA was not part of the discussion as a reason for lay off until the end of the MHRB investigation, but so late into that, that it wasn't even put into any of the Defense during the Investigations (Doc. 142-SDF #86, 98, 99)There is no record of a loss of AQHA contract in the June 13th, 2017 email, the email that directly corresponds to the timeframe Eaton was laid off,(shows Montana Silversmiths was in good standing with AQHA)- Eaton was laid off 2 days later (Doc. 142-SDF #87, 97)

1) Justin's performance Evaluation given by Lance Neirby, VP, stated "Select design/engraver and implement by July",(Doc. 142-SDF #116(v)) one month after Eaton's lay off, and ongoing discussion of

TRYING to hire someone to take over Eaton's position.(SDF#116(d))-Hiring Andrew directly before laying Eaton off, showing ongoing need for engravers, just hard to find and train(SDF #37), which was during the hiring freeze (Doc. 142-NEW ATTACHMENT #4; SDF #33)

2) Justin Deacon and David Cruz both said they wanted Eaton gone during the AEM investigation that concluded on June 9, 2017(Doc. 142-SDF #71, 72). Deacon stated he would leave his career over this.

The totality of the circumstances shows retaliation for claims brought forth by Mr. Eaton. The performance evaluation impaired Eaton's ability to be promoted at all, to receive any type of advancements (To a Master engraver, where Eaton could have been paid double), pay raises. Justin said Eaton could have done Master engraving which would have yielded higher pay. (Doc. 142-SDF#122). There was no documentation of any flaws with Eaton's interaction with co-workers or sidestepping until Eaton's performance evaluation. Just as in *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132, n.4. (9th Cir. 2003),

1. Eaton was cross-trained well and could have done Master buckles, the highest level of engraving, higher than any other engraver to date (Doc. 142-SDF#22, 121-128)

2. Eaton was of good character (Doc. 142-SDF#34, 116(g and h), #131(i)

3. Eaton had no DOCUMENTED admissible evidence showing disciplinary actions, and no verbal warnings, and had good performance evaluations scoring the highest you could get on "interaction with co-workers" in 2016 (SDF #45; Doc 105-10 at 25-26), the year before they dropped this very area to the worst level in 2017.(Doc. 113 at 5).

4. The court has already ruled that the two changes/degraded marks to Eaton's performance evaluation of 2017 degraded from 2016 performance evaluation were unwarranted (Doc. 96-23 at 22:14-18).(Doc. 113 at 19-24).

5. There was no legitimate business reason/judgment to downgrade Eaton's performance evaluation, except to throw him into the layoff.[20](Doc. 142-SDF #47)

Thus, according to *Crawford, 555 U.S. at 276* (Cited from Doc. 113 at 19) ("When an employee communicated to her employer a belief that the employer has engaged in….. A form of employment discrimination, that communcation virtually always constitnutes the employee's opposition to the activity")- the The Court has already agreed Eaton's raising of his concerns to Montana Silversmiths HR and VP fall under protected activities.  Especially since Eaton had also spoke about getting a lawyer and

---

[20] Please note that this is with regards to the FIRST AND second '4' ratings on Eaton's Performance Evaluation, which states(1) "Sidesteps proper reporting of concerns outside management hierarchy"(Doc. 105-10 at 37; PLTF 1730)(SDF#_47_)which should not have been low, because the only time Eaton did this was when he was complaining of sexual/racial harassment as noted in Collette's Documents in 2015 (Doc. 105-7 at 56 #5; MTS 46) and Eaton's Affidavit (Doc. 103-1 at # 30,39, 40-43,53-54, 61-62) AND according to the employee handbook, he could report issues of harassment to anyone in upper management (Doc. 105-Doc. 105-8 at 6¶ 5; MTS 168) and (2)  the Second poor rating that was changed to not getting along with supervisor–Eaton got along with Deacon until the April 5 meeting,(Doc 105-9 at 3 #9; MTS 292)– *Generally, how is your working relationship with Robert Eaton?*
     *A: I honestly thought he and I got along pretty well. We have a lot of stuff in common---*\*\*\*\*\*\*\*\*\*

calling the EEO in his meeting with Lance on April 4th, 2017 (SDF #50) and Colette

on April 5th, 2017 (SDF# 55;  Doc 113 at 19). See *Reeves v. Sanderson Plumbing*

(2000) 530 U.S. 133, 147, 120 S.Ct. 2097 where "Proving the employer's reason false

becomes part of the greater enterpise of proving tath the real reason was intentional

discrimination". Please make judicial notice that *Yanowitz v. L'Oreal USA, Inc.*(2005)

36 Cal.4th 1028 [32 Cal.Rptr.3d 436] "liberalized the test for determining what level

of adverse action was sufficient to support a retaliation claim. In the process, it also

stressed that real-world considerations were controlling. In particular, *Yanowitz* held

that courts "need not ... decide whether each alleged retaliatory act constitutes an

adverse employment action in and of itself," but instead must evaluate whether the

"totality of the circumstances "of a "pattern of systematic retaliation" "is reasonably

likely to impair a reasonable employee's job performance or prospects for

advancement or promotion." (*Id*. at 1055-1056.)". Thus, in looking at the totality of

the case, it shows continual retaliation of Eaton for reporting violations in public

policy with ongoing degradations, ending in downgrade performance evaluations,

low-balling Eaton's cross-training, and ultimately laying Eaton off when in fact, his

skills uphold the constant needs and backbone of the Montana Silversmiths company.

The defendants try to steer away from using the Performance evaluations as Criteria

for the layoff and put more emphasis on Cross training.  The cross training Matrix was

inaccurate because Justin, the supervisor to the engraving department and only one

who had the expertise to fill out the Cross training matrix and update it, did not update

it. Justin said this himself in his deposition. (SDF #120-128, #22, SUF#20,

41-Eaton's direct responses) thus it was invalid.

6. Did the Court Err in making inferences about the April 5th meeting in the

second summary judgment and not allowing Eaton's director evidence, which

would substantiate his claims, but instead using hearsay from the other party as

a way to dismiss Eaton's case?

## CONCLUSION

Montana Silversmiths never presented evidence on and DID NOT defend the 2nd

score of 4 on the performance evaluation.[21] The Defendants did not meet their burden

of proof, to show a legitimate reason for the lower marks on their evaluation. Thus,

Eaton should maintain this case as a matter of law. Eaton contends that his main

evidence was never addressed, including: 1) Justin's performance evaluation of April

3, 2017 stating, "Create a selection process for the next engraving candidate and

implement by July"[22], why would they lay him off, if they needed engravers? 2)

Colette not letting Eaton return to work, stating, "The Grievance investigation and

Eaton coming back to work go "hand in hand"?; 3) Why was Andrew (a boy in his

20s) brought in during the alleged hiring freeze; 4) Why does Montana Silversmiths

degrade Eaton's character when Justin said "we got along fine"? (Doc. 105-9 at 3)

Robert A Eaton, Pro Se
Sept. 12, 2022

---

[21] Comment regarding "Sidesteps proper reporting concerns outside of the management hierarchy"(Doc. 105-10 at 35).
[22] Doc. 105-13 at 31-32

CERTIFICATE OF SERVICE

Certificate of Service

I hereby certify that on the 12TH <sup>th</sup> day of September, 2022, a 2 copies of the previous document was served on the following persons by the following means:

_____X___MAIL

                                                     (7 copies served to)

Moulton Bellingham, PC                   U.S. Court of Appeals for the

27 North Street, Suite 1900             Ninth Circuit

P.O. Box 2559                              P.O. Box 193939

Billings, Montana 59103-2559         San Francisco, CA   94119-3939

Telephone: (406)248-7731

FAX: 406-248-7889

ROBERT EATON, PRO SE