9th Cir. Case No. 22-35480



RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

JAN 19 2023

FILED _____
DOCKETED _____ _
                        DATE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

___Robert A. Eaton_____      9th Cir. Case No.__22-35480_____

Petitioner(s),                   Agency Case no._1:18-cv-000065___

vs.

___Montana Silversmiths_____

Respondent(s).

## PETITIONER'S INFORMAL REPLY BRIEF

*(attach additional sheets as necessary, up to a total of 25 pages including this form)*

**For the optional reply in response to respondent's answering brief(s) only.**

List each issue or argument raised in the answering brief to which you are replying. Do not repeat arguments from your opening brief or raise new arguments except in response to arguments made in the answering brief(s).

## <u>Issue/Argument Number 1</u>

What is the first argument in the answering brief to which you are replying?

**The District Court Properly Disposed Of Eaton's Claim Relating to FMLA leave was under Retaliation noted in the Pretrial Conference (Doc. 39 at 17-18 ).**

What is your reply to this argument?

Eaton discussed causes of action within all of his Brief's (3-SER-294-319=Doc. 48, Doc. 103, Doc. 143) in which Causes of action Under FMLA 1) Interfere with, restrain, or deny the exercise of, or attempt to exercise, an employee's FMLA rights (29 USC 2615(a)(1); 2) Discharge or discriminate against an individual for opposing any unlawful practice under the FMLA (29 USC 2615(a)(2) and (b). What is very important to note is that the District Judge wrote in each of Eaton's counts -that each count was "barred" by another count- this allowed the dismissal of all claims within Eaton's case- by barring the review of each count by another.[1]

---

[1]Now, illnesses diagnosed as minor may qualify as FMLA protected, if they meet the incapacity and continuing treatment test after the certification period. For example with a hiatal hernia, normally a minor problem managed by antacid, was retroactively entitled to the FMLA leave because the employee saw a physician twice in a matter

Eaton's claim regarding FMLA entitlement -The Family Medical Leave Act of 1993, (FMLA), 29 U.S.C. §2601, et seq., entitles "eligible" employees of "covered" employers to take unpaid, job-protected leave for family and medical reasons specified by the statute for twelve workweeks in a 12-month period or twenty-six workweeks during a 12 month period for military caregiver leave. The FMLA, 29 U.S.C.§2615 provides employees with a cause of action against their employers who interfere, restrain, or deny their rights to FMLA leave or restoration to the same or equivalent position. Eaton made a Claim/inference with FMLA leave in his 2nd, 3rd, and 4th Amended Complaints, specifically stating that he was laid off while on worker's compensation- also, in Eaton's first Pretrial Conference (Doc. 39 At 18), Eaton states, "Eaton was on Workers Compensation, not allowed FMLA, even with his need for extended leave" . This was supported in Eaton's brief. The problem with the timing of the factors with regards to Eaton's filing of his Objection to the "Breach of Contract" subsection in his fourth Amended Complaint, is Eaton objected to the dismissal of the Breach of Contract on August 18, 2020, in which the dismissal was not granted by the District Court Judge (Dismissal granted dated March 1, 2021) until after Eaton put in his brief in response to Montana Silversmiths FIRST request for Summary Judgment (Dated January 4, 2021- Doc. 102, Doc. 103, Doc. 104), which addressed FMLA in more detail[2], including:On April 10th, 2017, Eaton returned to work at about 5: 30 am. Eaton hand delivered Colette Schlehuber, HR, a copy of Eaton's Grievance letter (ATTACHED **EXHIBIT #1-H**; MTS 81-84). At this time, Eaton asked Colette about Short Term disability and FMLA leave.(corroborated in Collettes' deposition). Colette stated that Eaton was not eligible for FMLA leave or short term disability and neither run congruent with Work Comp leave(ATTACHED **EXHIBIT 3-A**-MTS 51; Colette Deposition 55:10-23 ATTACHED **EXHIBIT 3-C**)(ATTACHED **EXHIBIT 3-B**-PLTF 3000-3076 Employer's Guide to FMLA) However, in Collette's Deposition, she confessed that Eaton did qualify for FMLA leave, it can run congruent with worker's compensation, and after Eaton requested information on his benefits, she did not provide any eligibility notice.

(The Employer's Guide to The Family and Medical Leave Act (PLTF 3019)
    *"After an employer has determined an employee's FMLA eligibility status, the employer must:*
- *Provide an Eligibility Notice to the employee, either orally or in writing, informing the employee whether he or she is eligible for FMLA leave; If the employer determines that the employee is not eligible for FMLA leave, it must state at least one reason why the employee is not eligible.*

Additionally, a panel of US court of Appeals for the Seventh Circuit issued an opinion on Wednesday (6/3/22) that provides a claim for 'interference' under the Family and Medical LEave Act does not require a finding that the employee was actually denied leave. Any words or actions that would discourage an employee from taking leave will be enough *Ziccarelli*, 35 F.4th at 1084 (citing *Lutes v. United Trailers, Inc,*, 950 F.3d 359, 363 (7th Cir. 2020); *Preddie v. Bartholomew Consolidated School Corp.,* 799 F.3d 806, 816 (7th Cir. 2015)). The Seventh Circuit ultimately determined that a denial of leave is not required to constitute FMLA interference – stating "an employer can violate the FMLA by discouraging an employee from exercising rights under the FMLA without actually denying an FMLA leave request." Id. at 1081. The Court therefore reversed the lower court's grant of summary judgment on the interference claim, remanding the matter back to the lower court for further proceedings. Id. at 1092.

    Eaton had requested front pay, back pay, and emotional damages for his losses, in which FMLA was included.

---

of a few days, thus satisfying the continuing treatment test. The eighth circuit later exhibited more generosity by suggesting that three day incapacity may occur at any time during the entire illness, even after termination of employment. The regulations promulgated under the FMLA states that employees eligibility is confirmed when the leave is requested, an employer may not challenge eligibility, further, if an employer fails to notify an employee of his ineligibility within two days of the leave request, the employee becomes eligible for the leave. However, Colette stated in her Deposition that Eaton Qualified. Additionally, the "Risk of Ignorance" that the FMLA may apply rests with the employers. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but only state that leave is needed (FMLA, R. 2012), which Eaton did in April, and Again on June 1st, 2017.

[2] The Judge did not address Eaton's claim which asserted a cause of action in his Summary Judgment Doc. 103, because she instead dismissed Eaton's Contract Claim 2 months after Eaton's Summary Judgment response was put into the Court.

Eaton did give proper notice for asking for FMLA leave, which was corroborated via Colette Schlehuber's deposition (**NEW EXHIBIT 1-T** Doc. 96-19: 54-57). Eaton went over his benefits when he was off, noted in his Summary Judgement and statements of Disputed and undisputed facts.

- This should be looked at by a jury not a judge.

IN Document 12 second amended complaint, Eaton inferred not being allowed FMLA when he was discharged while on Work Comp.

IN Document 28, judge Cavaan discussed FMLA under the heading of Disability Discrimination

IN Document 39, Eaton addressed not being allowed FMLA leave, even with his need for extended leave in his Pretrial Statement (Doc. 39 at 18). This was under his retaliation heading.

IN Document 48 (fourth Amended Complaint) Eaton addressed FMLA leave under the breach of Contract heading. According to Montana Silversmith's own personnel policy discussed in their handbook ( 2-SER-223; MTS 191) FMLA leave would run congruent with work comp.  If this was true, Eaton was laid off 8 weeks into is 12 week allotted period via FMLA, showing a cause of action under FMLA. Additionally, Colette was aware, Eaton needed extended leave and was running out of PTO, so he was wanting to come back early- she wouldn't let him and he had no benefits left, so he was pushing to go back to work because he had no pay and would lose family medical benefits.

Therefore, FMLA leave was mentioned several times throughout the lawsuit and brought up in more detail in Eaton's Summary judgment response with details to Colette's deposition agreeing that Eaton would have qualified for FMLA leave in her deposition and also, she stated they discussed benefits in her Memo, which was part of Eaton's ADMISSIBLE evidence (ATTACHED **EXHIBIT 1-T**; Doc.105-3 at 14-16; Doc 105-12 at 1; Doc. 105-7 at 38-41)

In *Harrison v. Harrison,* 180 N.C. App. 452 (2006)- the Court held that pro se litigants are required to meet minimal standards of compliance with the Rules of Civil Procedure in fairness to opposing parties.  So, isn't noting that Eaton was not allowed the FMLA leave within the brief - not allowing or restricting Eaton's FMLAs, a minimal standard ?

**Issue/Argument Number 2**

What is the second argument in the answering brief to which you are replying?

**PURSUANT TO FED. R. CIV. P. 78, THE DISTRICT COURT DID NOT ERR IN DENYING EATON'S REQUEST FOR A HEARING ON MONTANA SILVERSMITHS' FIRST MOTION FOR SUMMARY JUDGMENT.**

What is your reply to this argument?

There should have been an evidentiary hearing, if there was any question as to what evidence was put in or if there were questions or confusion with regards to the evidence provided in the summary judgment.  If a state law affords a person more rights than the federal law, the state law is legally presumed to prevail within that state, especially when state laws are developed in accordance to federal rules, typically.  Document 113 at 28-31 stating Eaton did not extend evidence, " any evidence illustrating that the impairment limited one or more major life activities…" However, the judge would not allow Eaton the showing of his evidence, which Eaton provided in Document 114, attempted in interlocutory appeal. He was not allowed an evidentiary hearing, request for reconsideration, interlocutory appeal or any means to correct this, however, the Defendants/Respondents were allowed a second summary judgment because they did not provide an argument regarding the existing claim which appears significantly biased. Eaton had hundreds of documents to show his significant history of back issues/back surgeries, and ongoing medical issues with Eaton's hand to survive the stipulations for ADAAA and showed these in Document 114 Objection, request for reconsideration, and the interlocutory appeal-,however, was not

allowed to provide his admissible evidence to show. Also, Eaton provided around 1000 pages of exhibits, which, stands to reason, could be confusing and a hearing would clear this up.

**Issue/Argument Number 3**

What is the third argument in the answering brief to which you are replying?

**THE DISTRICT COURT PROPERLY CONSIDERED AND APPLIED THE FACTUAL EVIDENCE IN GRANTING SUMMARY JUDGMENT FOR MONTANA SILVERSMITHS.**

What is your reply to this argument?

Respondents state in their Appellee's Answer Brief (Dkt Entry. 7 at 11) "On summary judgment, Eaton failed to properly rebut Montana Silversmiths' Motion through omitting any admissible material facts." also stating that "A genuine dispute of material fact arises only when there is sufficient evidence for a reasonable fact-finder to return a verdict for the non-moving party". In Eaton's first Summary judgment (Doc. 103, 104 105), as stated above, over 1000 pages of evidence and Depositions, which a reasonable person would infer could not possibly be all self-serving.

Eaton Requests the Appeals Court to even consider these 20 or so pieces of admissible factual evidence within his case to decide if these are self-serving statements or actual admissible material facts and evidence that would sway a "fact-finder". Eaton produced several documents which were admissible in federal court. Fed Rule of Evidence 803(6)-Under the Federal Rules of Evidence, business record exception- a party must show that: The record was made by a person with knowledge of the information contained in it; The record was made at or near the time of the event; It was the business' regular practice to make these types of records– All of the below evidence is either a deposition or records from Montana Silversmiths, not even Eaton's notes or Affidavit- Eaton's notes and Affidavit mostly are supported and substantiate the records provided by Montana Silversmiths to Eaton in discovery. Fed Rule of Evidence 803(6). Additionally, a recent Ohio Tenth District Court of Appeals decision makes clear that even a business record prepared by another business, that was incorporated into the business records maintained by your company, can be introduced by a qualified holder of the business record from your company- *State Farm Mut. Auto. Ins. Co. v. Anders 2012 Ohio 824* (10thDist., Franklin County, Mar. 1. 2012). Thus, Eaton's evidence of AEM investigations and AQHA emails should qualify as well as Justin Deacon's Performance evaluation as admissible evidence.

1) Justin Deacon's Performance Evaluation from 2017 and 2019 (ATTACHED **EXHIBIT 4-A**- MTS 002287-002292)- statements include: "Create a selection process for the next engraving candidate, Implement new trainee program by July"-dated 4/1/17 and Eaton was laid off in the engraving department in June of 2017 (MTS 002288- in comments section); In the 2019 Performance Evaluation under "Willingness to work OT" Justin wrote "I would like to see an increase in training, or adding quality employees, so that we are evenly staffed so that OT [overtime] is not necessary" (MTS 002292) as well as- Under "productivity" in (MTS 002291- ) states in comments "Partner with Lance to select, onboard and train a designer, engraver and fully develop Usiel"

2) Robert Eaton's Performance Evaluation of 2016 states Eaton was "Always in good spirits"(ATTACHED **EXHIBIT 4-B**- PLTF 726-727)- shows Eaton's good character that was attacked by Appellee in 2nd summary judgment.

3) Robert Eaton's Performance Evaluation of 2017, why was he given a 4 for going "out of the hierarchy" when in Montana Silversmiths Handbook, it states he can go to anyone, including HR and administration with concerns of racial/sexual harassment. AND changing not getting along with Travis (already in permanent record) to not getting

along with Justin(after permanent record and during meeting when Eaton had to bring up sexual/racial harassment( (ATTACHED **EXHIBIT 1-B**)

4) Justin Deacon's Deposition (ATTACHED **EXHIBIT 4-C**) 1)Section describing how Eaton was well Cross trained Dep. 105-4 at pg 41-42); 2) (Doc. 105 4 at 42- Deposition page 23), trying to hire Justin's older brother after Eaton was laid off  (Doc. 105-4 at 44 (Dep. page 31),Section describing how Justin knew nothing about Eaton being fired), Overtime (Doc. 105-4 at pg 45), Section about Training Travis over Eaton (Doc. 105-4 at 46), about Lance forcing Deacon to switch Eaton's performance Evaluation (Id. 47-48), Eaton not using the word 'gun' (Id 50) - honestly the entire Deposition shows evidence including Sections describing how Justin was the only one who knew about cross training and did not ever update/see the cross training Matrix and the section describing how Lance made Justin downgrade marks and add Travis to Eaton's 2017 Performance Evaluation, Deacon also stated he never saw Steve Muellner's memo that states they would tell the Supervisor's who in the department they were going to fire. If Justin was supervisor, why was he not told?

5) Linked to Steve Muelner memo (Doc.  105-13 at 20–ATTACHED **EXHIBIT 4-D**)

6) Colette Schlehuber's 2015 notes (Doc. 105-7 at 38-41; 54-55- ATTACHED **EXHIBIT 4-E**) stating Eaton's concern's for sexual/racial harassment, and stating she was investigating.

7) Colette Schlehuber's Deposition (Doc. 96-12 Ex. C) 1) regarding FMLA (ATTACHED **EXHIBIT 3-C**; Stating several times, that they are continually looking for and would onboard an designer/engraver,

8) Colette Schlehuber's memo regarding Eaton handing in his grievance ATTACHED **EXHIBIT 3-A**- discussed benefits and shows Eaton's character, apologizing for the grievance letter.

9) Colette Schlehuber and Lance Neirby's email of April 5th meeting (ATTACHED **EXHIBIT 1-E,F**)

10) Colette Schlehuber's memo of the April 5th meeting (ATTACHED **EXHIBIT 1-G**)

11) Justin Deacon's AEM investigationApril 25th, 2017, Justin Deacon was interviewed by Associated Employer Group Justin stated " *I'll leave my career over this- I can't work with him.* (MTS 292)." (ATTACHED **EXHIBIT 4-G**)

12) David AEM investigation-April 25th, 2017 Associated Employers Group interviewed David Cruz (MTS 286#22) who stated, "*Honestly, I would rather he (re: Robert Eaton) didn't work here anymore*" signed May 15, *2017.*(ATTACHED **EXHIBIT 4-H**) -"smoking gun" evidence they wanted Eaton gone.

13) AQHA emails- these emails are between employees at AQHA and Montana Silversmiths, discussing how AQHA representatives are planning a trip to Montana to meet with Montana Silversmiths and infer that they want to make their partnership "stronger",-, these emails were dated June 13th through August, 2017, the day Eaton was discharged- thus indicating that no one at Montana Silversmiths was aware of a possible loss of AQHA contracts. Additionally, Colette Schlehuber, in her Deposition (Colette Dep 120: 1-25) states that there are no documents corroborating the theory about them knowing that they were going to lose this contract- this was only mentioned months after Eaton's discharge, after Eaton had begun a MHRB investigation AQHA contract was first mentioned within the investigation results in 2019. (ATTACHED **EXHIBIT 4-I**; Doc. 105-3 at 31; Doc. 105-12 at 14-20; Doc. 105-7 at 14 showing AQHA contract was draining Montana Sivlersmith's account and Montana Silversmiths chose not to renew). AQHA was not even in Steve Muellner's memo.

14) Medical notes (Doc. 105-9 at 58-88; Doc 114-1 at 13,14,89 ATTACHED **EXHIBIT 4-J**). Medical Notes Showing Eaton had handissues since 2015, with MD requested accommodations, which were never completed, and back issues that were documented as hx of spinal fusion

15) Curt Robbins Deposition-**Curt Robbins Dep (47:11-23**)- says how Montana Silversmiths is always looking for engravers (Doc.. 105-4 AT 22 ATTACHED **EXHIBIT 4-K**; MTS 002287-002292). And Lance Neirby Depositions.

16) **Lance Deposition 46:4-7**(*Q: Robert Eaton in reference to Exhibit 17) Could you tell me what that means?*
   a) *(A) It means that we were going to create a selection process for the next engraving candidate and implement that program by July.*

17) Amy Deposition- how they hired a young engraver briefly after Eaton was discharged (Doc. 105-4 at 4-5 ATTACHED **EXHIBIT 4-L**)

18) Rick Deposition-how they hired a young engraver briefly after Eaton was discharged (Doc. 105-4 at 669 ATTACHED **EXHIBIT 4-M**)

19) Lay off plan (s) (MTS 314, MTS 1176  ATTACHED **EXHIBIT 1-Y** ) show inconsistency in lay off plans AND that Lance was in charge of "performance evaluations to determine cost cutting initiatives"

20) Lance Neirby/Colette April 4th, 2017 email (ATTACHED **EXHIBIT 1-E,F**)

21) Entire Documents 103, 104, 105, 142 (ATTACHED **EXHIBIT 5-A**), 143 (ATTACHED **EXHIBIT 5-B**) and attachments which have extensive documentation about Eaton 's claims (stated on the 1st page of Eaton's Opening Appeal Brief for Appeal) in first and second summary judgments, with associated evidence, which is NOT all self-serving and is admissible evidence.

In *Weil v. Citizens Telecom Services. Co* (9th Circ. Court of Appeals, April 29, 2019). The court of appeals panel reversed in part the district Court's summary judgment in favor of defendant employers in an employment discrimination action under Title VII, 42 USC  1981, and the Washington Law Against Discrimination.  Reversing the district court's summary judgment, the panel held that the district court erred on excluding on hearsay grounds a statement proffered by the plaintiff. The panel held that, under Federal Rule of Evidence 801(d)(2)(D), hearsay does not include statement offered against a party, made by the party's employee on a matter within the scope of that employee's employment, so long as the statement was made while the employee was still employed by that employer. The panel held that, properly considering the statement as admissible evidence of pretext, the plaintiff met his burden on summary judgment. Eaton has proven that he was in a protected class, he performed satisfactorily, and showed that his documentation during business hours were corroborated by other employees within Montana Silversmiths (Doc. 103, 104, 105, 142, 143- ATTACHED **EXHIBITS 1 AND 5**)

Within *Weil v. Citizens Telecom Servs*. Co claim, the 9th Circuit court of appeals stated "Because we may only consider admissible evidence when reviewing a motion for summary judgment *Orr v. Bank of Am. NT&SA*, 285 F. 3d 764, 773-75 (9th Cir. , 2002), we take up the evidentiary issue first.  Under the general rule of evidence, all relevant evidence is admissible. Fed. R. Evid. 402. Here, we determine whether the district court properly excluded otherwise admissible relevant evidence under Federal Rule of Evidence 801. We review the district court's construction of Rule 801 de novo. Within the Federal Rules of Evidence, Montana Silversmiths, nor Judge Watters specified why they were not looking at the evidence provided by Eaton, only that with was inadmissible or 'self serving' -additionally, the word 'confusing' was used several times

It should be noted, in *Anderson v. Liberty Lobby, Inc.* 477 U.sE. 242, 249 (1986)"At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial". This is what Eaton reports Judge Watters did in Doc. 113 and when dismissing Eaton's claims,

was weighing the evidence herself.  Also reviewed in *Weil v. Citizens*, the court noted that " in reviewing motions for summary judgment in employment discrimination contact a court must 'zealously guard[] an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest*, 360 F. 3d at 1112. "Very little … evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive…. May suffice to raise a question that can only be resolved by a factfinder" *Schindrig v. Columbia Mach, Inc.* 80f3d 1406, 1409 (9th Cir. 1996).

**Issue/Argument Number 4**

What is the forth argument in the answering brief to which you are replying?

**THE DISTRICT COURT CORRECTLY FOUND THAT MONTANA SILVERSMITHS PRESENTED A LEGITIMATE NON-DISCRIMINATORY REASON FOR EATON'S TERMINATION IN GRANTING SUMMARY JUDGMENT.**

What is your reply to this argument?

"Proferred nondiscriminatory reason is merely pretext for discrimination" *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F3d 1027, 1037 (9th Cir. 2005). In Argument #3, above, Eaton shows that there is excessive evidence to show pretext. Eaton would like the court to review what a Reasonable Business Judgment means with regards to Montana Silversmiths. Montana Silversmiths is a company  in which engraving is the backbone of the company.  Therefore, laying off an engraver would never be a "Reasonable Business Judgment" and this is supported by the following:

**Eaton worked in the engraving Department of Montana Silversmiths, the most needed department-That's what the entire company is based on, designing/engraving on buckles and jewelry.**

Montana Silversmiths showed they are always looking for and hiring engravers. (Doc 105 pages 78-79). Additionally, all depositions report they are always looking for engravers and stating in the AQHA emails that they were getting more contracts.(Colette Deposition 75:12-16 ATTACHED **EXHIBIT 4-I**). The following contends that Montana Silversmiths needed and continues to need engravers and that they are hard to find:

> Montana Silversmiths needed design/engravers and still do, marking this on Justin's performance evaluation both in 2017 and 2019 (Doc . 105 Exhibit 51-MTS 2288 ATTACHED **EXHIBIT 4-A**).In Justin's performance evaluations between Justin and Lance Neirby dated in April, 2017 for July 2017 (Eaton was laid off in June of 2017 that year), they documented trying to find another engraver.[3] (Doc. 105; Exhibit 51-MTS 2288) in Productivity section "Partner with Lance to select, onboard and train a designer, engraver and fully develop Usiel (2019 Performance eval of Justin/Supervisor-Lance; Lance Dep 57:25-58:10; Colette Dep 89:4-14). (Doc 105 Ex. 51-MTS 2291-2) [4]The above shows the ongoing need for engravers.[5]Colette Dep (regarding Exhibit 15 MTS 2291

---

[3](Lance Dep 55:1-7; Curt Robbins Dep 47:11-23)  *"Create selection process for next engraving candidate, implement new trainee program by July.(Dated 4/3/17)-same time as Eaton's performance evaluation.(Justin's performance evaluation by Lance)*
Lance Deposition 56:4-7
*(Q: Robert Eaton in reference to Exhibit 17) Could you tell me what that means?*
*(A) It means that we were going to create a selection process for the next engraving candidate and implement that program by July.*
Curt Robbins Dep (47:11-23)
(A: Curt Robbins) *Creates a selection process for the next engraving candidate. Implement a new training program by July.  I'm sure where that's coming from is the same thing, is that engraving is a vital part of Montana Silversmiths business. And again, to sustain that level of quality and so forth, I'm sure that they do – are continually looking for candidates and having a process available to get the proper candidates.  I mean that doesn't surprise me that they would want to do that to solidify the long- term business.*
[4] States "Willingness to work OT/self evaluation "Area of focus from 2018 to 2019–"I would like to see an increase in training, or adding quality employees(referenced to engraving department), so that we are evenly staffed so that it (OVERTIME)  is not necessary" "Create a optimal team layout to address both designs, fab, and engraving to meet current and future need - work with Lance to accomplish on boarding the right employees.
[5] Colette Dep (regarding Exhibit 15 MTS 2291 89:4-14)

89:4-14).

MTS hired Andrew months before Eaton was laid off and Lance Nearby States in AEM investigation that even to that day if Andrew showed improvement, they would hire him back (MTS 304 #18-Doc. 105-9 Aat 71; ATTACHED **EXHIBIT 4-N**).[6]

Montana Silversmiths briefly hired someone in the Engraving Department after Eaton's lay off. Ami Braley design/fab, and Rick Waltner engraving, both stated in their depositions that a young engraver was hired for a brief period at Montana Silversmiths directly after Eaton's lay off.(ATTACHED **EXHIBIT 4-L,M**)

In Summary, the above shows that at Montana Silversmiths, engravers are the backbone of the company, difficult to find someone as skilled as Eaton for that position, and they were looking for engravers before, after, and even during Eaton's lay off.   Therefore, there was absolutely no legitimate business reason to lay anyone off in Eaton's specific department of engrave/design and this decision does not make sense as a reasonable business judgment within Montana  Silversmiths, Especially when Eaton was hired for Engraving AND Design. Thus, the material provided in the new light of the new law presents in favor of Eaton, showing there, in fact, within the confines of needing a "reasonable business judgment" for a legitimate business reason, Montana Silversmiths falls short.   Additionally, in Collette's Deposition, she also states that their RIF, included only cost saving initiatve for $250,000 was their goal, which was met with laying off Curt Iverson, an employee they took off of their original documents sent to Eaton- with laying Eaton off, they exceeded their goal to $295000, more than the amount of Eaton's yearly wages (ATTACHED **EXHIBIT 4-O**).   Additionally, Montana Silversmith stated that they "lost" the AQHA contract, however, in reviewing emails between Montana Silversmiths and AQHA (Doc. 105 Exhibit 46-MTS 388-439). There was no indication that MTS thought they were going to lose the contract, even in August, 2017 (2 months <u>after</u> EAton's lay off) when AQHA[7] was booking a flight (MTS 388 **EXHIBIT 4-I**)). Additionally, (MTS 405 **EXHIBIT 4-I**)), MontanaSilversmiths made a reference to dropping AQHA contact as making them a "healthier department without draining accounts and dragging us down". Thus, inferring that AQHA was a costly partnership to maintain". (MTS 408 **EXHIBIT 4-I**)- shows the 9-25-17 Activity Report stating "PBR...95% chance we drop PBR" showing that they typically document anticipation of loss or dropping of a contract in their Activity Reports. Therefore, if they were worried about losing AQHA, it should have been documented in another "Activity Report" However, Colette, HR. stated in her Deposition (Collette Dep 120: 1-25 ATTACHED **EXHIBIT 4-I**) that they had NO documentation whatsoever regarding any anticipated loss of the AQHA contract. THus, they could not have known this until after Eaton's lay off.  Additionally, there is no documentation of Montana Silversmiths showing that the AQHA substantially impacted the engraving department AND this could not have impacted the engraving department when they laid Eaton off because the Contract went through December, 2017 and they had to make buckles until then. The emails should carry greater weight as would the taxes (that were never provided, but requested multiple times) than the verbal estimations of the employees because the documents were made at the time that this happened by AQHA and Montana Silversmiths and the employee's verbal recall was made years later.  Thus, the above reveals an ongoing question of law.

**Issue/Argument Number 5**

What is the fifth argument in the answering brief to which you are replying?

---

[6] *(, perhaps we were going to look to onboard another engraver, designer. I don't know.*
[6] All during the alleged hiring freeze and lay off.
[7] PLease take judicial notice that these emails show no noted anticipation of loss of AQHA contract until September or October, 2017) 2-3 months after Eaton was laid off.

## THE DISTRICT COURT PROPERLY GRANTED MONTANA SILVERSMITHS SUMMARY JUDGMENT ON EATON'S WDEA CLAIM.

What is your reply to this argument?

Eaton did develop an argument regarding the WDEA in his opening Appeal brief, however, since this is a piece of the totality of the case, the argument is embedded within the entirety of the brief, which discusses Montana Silversmiths failure to follow its own personnel policy and is referenced to arguments in previous documents put into the lower courts (Doc. 80, Doc. 103, Doc. 104, Doc. 105, Doc. 120, Doc. 125, Doc. 142),. Additionally, Eaton describes and argues the legitimate business reason and legitimate business judgment, which is also a piece of the WDEA claim. Eaton would like to further assert that, although, as mentioned-. MCA 39-2-904 which include "The employer materially violated an express provision of its own written personnel policy prior to the discharge, and the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer. This deprivation goes against the WDEA, which expressly states that 'the employer materially violated an express provision of its own written personnel policy, which the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer.- This state law runs in conjunction with and attached to Federal Employment Law § 5.02 (2015). Montana Silversmiths personnel policy and Handbook for the WDEA are aligned with Federal Public Policies and their violations according to racial harassment and sexual discrimination, thus are aligned accordingly.

## PROTECTED ACTIVITY

Eaton engaged in a protected activity when he made several formal complaints about his direct supervisor engaging in sexual harassment and racial discrimination. Eaton's complaints of sexual/racial harassment are documented by Colette Schlehuber in July and August, 2015 (ATTACHED **EXHIBIT 4-E**), Eaton's documented ongoing issues with witnessing sexual/racial harassment, Eaton reported again to Lance Neirby on April 4&5, 2017 (ATTACHED **EXHIBIT 1-F;** Doc. 96-4 at 2-4 MTS 59-60). This, by definition, is a protected activity.

## EMPLOYER WAS AWARE OF THE COMPLAINT

Eaton can prove that Montana Silversmiths was aware of his complaint and that it "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. National Realty & Development Corp*, 136 F. 3d 276, 292 (2d. Cir. 1998). This is proven in Eaton's ability to provide direct evidence in his meetings with Colette Schlehuber in July and August 2015 regarding his concerns with feeling like he would be retaliated against for reporting sexual/racial harassment by his direct supervisor. Eaton reported sexual/racial harassment on the April 4th to Lance Neriby documented Email at 5:20pm April 4th (MTS 59-60). These accounts were documented by HR and VP and corroborated by Eaton's handwritten notes. On April 4th, 2017 Eaton underwent meetings with Lance, then with Lance and Justin (April 5th), as well as with Colette in another April 5th, 2017 meeting both times stating he would be contacting an attorney and the EEOC regarding his concerns as well as describing his concerns of witnessing racial/sexual harassment of his direct supervisor, Justin Deacon- which are all documented by the Montana Silversmith employees HR, and VP in emails and memos and corroborated in Eaton's notes-and they retaliated against him for this. *Archuleta v. Corr. Corp. of Am.* 829 F. App'x242, 243 (9th Cir. 2020) states that "Filing an internal complaint pursuant to an established procedure, raising concerns in a discussion with a human resources representative, or filing an EEOC complaint are all protected activities". In addition, because Eaton stated to Lance Neirby VP, and Colette Schlehuber, HR about having to contact the EEOC, which were both documented, not only by Eaton, but by the HR and VP, is protected according to *EEOC v. Luce, Forward, Hamilton & Scripps*, 303 F. 3d994, 1007 (9th Cir. 2002) *on reh'g banc*, 345 F3d 742 (9th Cir.

2003), which states, "[t]he statutory protections against retaliation also extend to an applicant or an employee who informs his employer of his intention to participate in a statutory proceeding, even if he has not yet done so." "[a] plaintiff, though not within a protected class, may satisfy the first prong of this test based on [his] association with or advocacy on behalf of protected employees." *Barrett v. Whirlpool Corp.*, 556 F. 3d 502, 515 (9th Cir. 2009). Therefore, changing Eaton's evaluation, placing it in his permanent file ( MTS 176), and using it for laying him off all wholly constitute retaliation via adverse actions. This, coupled with two supervisors stating in Eaton's grievance investigation (Justin Deacon and David Cruz) that they wanted Eaton gone, shows pretext and adverse actions.  Eaton shows that he meets the 3 stage criteria for prima facie case for retaliation  with respect to his performance evaluation with referencing anti retaliation provisions "more broadly" - referencing Title VII in *Burlington Northern Santa Fe Ry. Co. v White,* 548 U.S. 53 (2006).

## ADVERSE EMPLOYMENT ACTION

Montana Silversmiths alleges that they used a lay off plan. Within this layoff plan was the use of the 2017 performance evaluation for lay off. Additionally, with two employees, including Eaton's direct supervisor stating in their AEM investigation that they wanted Eaton gone, shows pretext and adverse employment actions. Thus, Montana Silversmiths utilized Eaton's 2017 performance evaluation as one of the criteria for laying Eaton off.   Therefore, Eaton can establish a prima facie case for retaliation with regards to his 2017 performance evaluation.

Negative evaluations, such as Eatons, especially with prior years evaluations high, can be considered an adverse employment action in several cases.  In *Yartzoff v. Thomas*, 809 F. 2d 1371, 1376 (9th Cir. 1987), includes, "undeserved performance ratings, if proven, would constitute an "adverse employment decision" cognizable under this section"; *Brooks v. City of San Mateo*, 229 F3d 917, 928 (9th Cir. 2000) "Among those employment decisions that can constitute an adverse employment action are … undeserved negative performance reviews"; and *Leleand v. City and Cty. of San Francisco*, 576 F. Supp. 2d 1079, 1098 (N.D. Cal. 2008) indicated that negative versus positive performance evaluation is a disputed issue of material fact for the jury to decide. Finally, *Rivera v. England*, 360 F. Supp. 2d 1104, 1120 (D. Haw. 2005) which summarizes that "negative comments 'beyond mediocre' constituted an adverse employment decision.

## INFERENCE OF CAUSALITY

Inference of causality can be shown via a causal link between the protected activity and the employment action. In order to provide this 'link' the temporal proximity between the two events must be 'very close' *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001). Eaton had reported the ongoing sexual harassment to another supervisor, David Cruz, in January, 2017 at which time this supervisor had stated he would let VP, Lance Neirby know.  There were 3-4 meetings regarding Eaton's claims of sexual/racial harassment and his downgraded performance evaluations, including April 4th, 2017 at 8 am with Justin Deacon, another that evening at 5:30 pm with Lance Neirby, and two April 5th, 2017 meeting (1) with Lance and Justin at around 8 am; 2) Lance and Colette at around 10 am. Montana Silversmiths cannot rationalize why Eaton received downgraded Marks on his 2017 performance evaluations and Eaton will prove that these marks are unwarranted. Eaton's meeting with Lance Neirby on April 4th, 2017 at around 5:30pm discussing his unwarranted downgraded marks and additionally, VP requesting information regarding Eaton's concerns with sexual/racial harassment–followed by the Meeting with Lance Neirby and Justin Deacon on April 5th, 2017 at 8 am discussing that the comments were unwarranted, further discussing Eaton's concerns with sexual/racial harassment directly to his direct supervisor, Justin Deacon, and changing his marks to 'not getting along with direct supervisor' even though Justin Deacon, himself stated they were getting along fine until this meeting, constitutes 'very close' proximity of time from the complaint to the adverse action as

well as unwarranted low marks on Eaton's performance evaluation. *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110(1st Cir. 1988). See also *Little v. Windermere Relocation, Inc*, 301 F. 3d 958 (9th Cir. 2002)("close time provide circumstantial evidence of retaliation that is sufficient to create a prima facie case of retaliation." *Passantino v. Johnson & Johnson Consumer Prod.*, Inc., 2121 F. 3d 493, 507 (9th Cir. 2000) (noting that causation can be inferred from timing alone); *Miller v. Fairchild Indus.* 885 F.2d 498, 505 (9th Cir. 1989)(stating that a prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearing ); *Yartzoff v. Thomas*, 809 F. 2d 1371, 1376 (9th Cir. 1987)(stating that sufficient evidence existed where adverse actions occurred less than three months after complaint was filed, two weeks after charge was first investigated, and less than two months after investigation ended).

Thus, this moves the Court into yet another new rule, controlling the question of law under Legitimate Business reason. On March 31st, 2021, Montana's governor signed a revised law HB254, for WDEA. Under this law, 'Good Cause" was clarified, which, Under the Act, it states that non-probationary employees must be discharged for "Good Cause". Good Cause is clarified to be in MCA 39-2-904 (2021)which include:

1."Legitimate business reasons determined by employer" that are reasonable business judgments.

2. "The employer materially violated an express provision of its own written personnel policy prior to the discharge, and the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer."

Eaton respectfully requests appeal under the new law requiring showing a Legitimate Business reason... Note "That are reasonable Business Judgements"(MCA 39-2-903(d)). Eaton would like the court to review what a Reasonable Business Judgment means with regards to Montana Silversmiths. Montana Silversmiths is a company in which engraving is the backbone of the company. Therefore, laying off an engraver would never be a "Reasonable Business Judgment" and this is supported by the following (NOTE: It appears Montana Silversmiths were allowed a 2nd Summary Judgment to address this, but the Courts wouldn't allow Eaton the Interlocutory appeal to address this.)

**Eaton worked in the engraving Department of Montana Silversmiths, the most needed department-That's what the entire company is based on, engraving on buckles and jewelry.**

Montana Silversmiths showed they are always looking for and hiring engravers. (Doc 105 pages 78-79). Additionally, all depositions report they are always looking for engravers and stating in the AQHA emails that they were getting more contracts.(Colette Deposition 75:12-16). The following contends that Montana Silversmiths needed and continues to need engravers and that they are hard to find:

> Montana Silversmiths needed design/engravers and still do, marking this on Justin's performance evaluation both in 2017 and 2019 (Doc . 105 Exhibit 51-MTS 2288 in supervisor comments).In Justin's performance evaluations between Justin and Lance Neirby dated in April, 2017 for July 2017 (Eaton was laid off in June of 2017 that year), they documented trying to find another engraver.[8] (Doc. 105; Exhibit 51-MTS 2288) in Productivity section "Partner with Lance to select, onboard and train a designer, engraver and fully develop Usiel (2019 Performance eval of Justin/Supervisor-Lance; Lance Dep 57:25-58:10; Colette Dep 89:4-14). (Doc 105 Ex. 51-MTS 2291-2) [9]The above shows the ongoing need for engravers.[10]Colette Dep (regarding Exhibit 15 MTS 2291 89:4-14).

---

[8](Lance Dep 55:1-7; 56; 4-7; Curt Robbins Dep 47:11-23) Stating that they're (MTS) was to create a selection process for the next engraving candidate and implement that program by July.

[9] Justin performance Eval 2018-States "Willingness to work OT/self evaluation "Area of focus from 2018 to 2019–"I would like to see an increase in training, or adding quality employees(referenced to engraving department), so that we are evenly staffed so that it (OVERTIME) is not necessary" "Create a optimal team layout to address both designs, fab, and engraving to meet current and future need - work with Lance to accomplish on boarding the right employees.

[10] Colette Dep (regarding Exhibit 15 MTS 2291 89:4-14) " *perhaps we were going to look to onboard another engraver, designer. I don't know.*"

MTS hired Andrew months before Eaton was laid off and Lance Nearby States in AEM investigation that even to that day if Andrew showed improvement, they would hire him back (MTS 304 #18-Doc. 105 exhibit 32).[11]

    a) Montana Silversmiths had someone in the Engraving Department after Eaton's lay off. Ami Braley design/fab, and Rick Waltner engraving, both stated in their depositions that a young engraver was hired for a brief period at Montana Silversmiths directly after Eaton's lay off.[12]

**PRETEXT**

**challenging the veracity or reasonableness of the employer's business judgment for taking the adverse action in question.**

- **AQHA- no evidence that they were going to lose this contract before laying off Eaton**
- **Matrix- 30 year artist with degree and specialized in metalsmithing over a 16 year old Travis Deacon - Justin had not filled out the Matrix and was not supposed to fill out the matrix for his son Travis Deacon according to the employee handbook because he was related to him.**
- **Performance evaluation- no disciplinary action, not on a performance plan- blind sighted with lower marks for Eaton**
- **engravers are the staple of the company**
- **Overtime shows a continued need for an engraver.**

In Summary, the above shows that at Montana Silversmiths, engravers are the backbone of the company, difficult to find someone as skilled as Eaton for that position, and they were looking for engravers before, after, and even during Eaton's lay off. Therefore, there was absolutely no legitimate business reason to lay anyone off in Eaton's specific department of engrave/design and this decision does not make sense as a reasonable business judgment within Montana Silversmiths, Especially when Eaton was hired for Engraving AND Design. Thus, the material provided in the new light of the new law presents in favor of Eaton, showing there, in fact, within the confines of needing a "reasonable business judgment" for a legitimate business reason, Montana Silversmiths falls short. This lay off has scarred Eaton's ability to make gainful employment.[13] Legitimate business reason is argued in another section. Thus, the above reveals an ongoing question of law.

**Issue/Argument Number 6**

What is the sixth argument in the answering brief to which you are replying?

**THE DISTRICT COURT PROPERLY GRANTED MONTANA SILVERSMITHS SUMMARY JUDGMENT ON EATON'S FEDERAL DISABILITY DISCRIMINATION CLAIM**

What is your reply to this argument?

Request for appeal revolves around the foregoing explanation of a controlling question of law. The court's summary judgment order (Document 113) states that Eaton could not show that he had a disability.

All parties and the Court have referred to ADA act of 1964; however, Eaton had not seen amended information in the ADAAA, which was not brought forth during arguments in summary judgment. The ADA Amendments Act of 2008

---

[11] All during the alleged hiring freeze and lay off.

[12] Amie Braley Deposition 12:14-20 *(Q: Robert Eaton) Do you know if they tried to hire any new engravers or apprentices?*
    *(A: Amie Braley) I think there was one boy-- I can't remember his name-- but he just couldn't, I guess pick it up, you know.*
 Rick Waltner Deposition(19:1) *(A: Rick Waltner) Yes, they brought a young man in and he tried out a little bit and then that was it. He didn't make it.*

[13] It is common practice for prospective employers to ask for employment history on applications and to ask applicants to explain reasons for separation from prior jobs. On the phenomenon of "scarring," see *J. Hoult Verkerke*, Legal Regulation of Employment Reference Practices,65 U. CHI. L. REV. 115, 147 (1998) ("Scarring occurs when employers rely on labor market signals, such as prior employment history or employment references, to deny a job to someone who could be profitably employed.").

(ADAAA) went into effect on January 1, 2009. The five changes to the ADA are significant and provide exception to materially different facts which were originally argued in the Summary Judgement. Amendments to the act include that:

1. The definition of the ADA "disability" must be both more 'flexible" and "broadly construed"
2. It expands the list of "major life activities"
3. It provides that courts can no longer consider whether "mitigating measures," such as medication or assistive technology, reduce the impact of impairment on an individual.
4. It states that diseases that are "episodic" or in remission may still be "disabilities".
5. It provides that employees who claim they are 'regarded as' disabled can now make an ADA claim, even if the 'perceived' disability does not impact a major life activity.

In enacting this updated law, Congress instructed that it should be interpreted to favor "broad coverage of Individuals under the ADA," and that courts must focus not on whether an employee is 'disabled' but on whether the "employer is complying with its obligations under the law'.

Therefore, even though Eaton can prove that he had a history of impairments and is providing new evidence to substantiate this, and Montana Silversmiths were aware, this should not be the focus of this section. The focus should be whether the employer is complying with its obligations under the law". *Nunes v. HIE Holdings, Inc., 2018*

"Disability" includes any impairment that is episodic or in remission if it would substantially limit a major life activity when active: and (Jan 1, 2009). To prove disability, Eaton must prove the following:

1. He was a "Qualified Individual with a Disability"
2. Montana Silversmiths knew about his disability
3. Eaton has a record of disability
4. Montana Silversmiths took an employment action against EAton because he had a disability, or a record of a disability .
5. Montana Silversmiths denied Eaton reasonable accommodations, after Eaton let them know there were accommodations needed going back to work.

A. He was 'Qualified Individual with a Disability". Please refer to All medical notes in **ATTACHED EXHIBIT 4-J AND EXHIBIT 1-K** as well as attachment in Doc. 105 and Doc. 142). These medical notes show that Eaton injured his back 5/2/01 while lifting a tire onto a drilling rig. He underwent 3 back surgeries in 2007, including a spinal fusion L5-S1 and spondolythesis, and spinal stenosis, and completed a Maximum Medical Improvement Assessment on 11/17/08(MTS5879-5891), at which time Dr. Lawrence Splitter summarized that Eaton's pain affected his ability to "sit and stand, lift overhead, grasp objects or reach for things, lift objects from the floor, bend, stoop, or squat, and his ability to walk or run". Thus showing under ADAAA "a record of physical impairment that substantially limited a major life activity" qualifies for disability. Even if Eaton did not have this, he is not required to present evidence that the employer believed Eaton was substantially limited in major life activities. *Nunes v. HIE Holdings, Inc., 2018*[14]

---

[14] "The appellate court held that the plaintiff was not required to present evidence that the employer *believed* that plaintiff was substantially limited in a major life activity. Instead, the plaintiff could simply show that the employer terminated plaintiff "because of" his knowledge of the shoulder pain, regardless of whether the employer actually perceived the shoulder pain as a disability, and The Ninth Circuit's expansion of the scope of the "regarded-as" disability definition follows decisions in the First, Fifth, Sixth and Tenth Circuits which similarly defined the definition under the ADAAA. Additionally, although the employer had argued that the ADAAA "regarded-as" disabled definition does not apply to "transitory and minor impairments," the appellate court noted that this exception is an affirmative defense with the burden of proof on the defendant, and not the plaintiff. The court held that the employer had not set forth evidence to establish plaintiff's shoulder pain was transitory and minor.Therefore, the appellate court held that Plaintiff had established a genuine issue of material fact as to whether the employer regarded him as having a disability.The Ninth Circuit further reversed the circuit court's holding that the plaintiff could not establish his shoulder pain was an actual disability. Specifically, the appellate court found that because plaintiff could neither work nor lift more than 25 pounds nor lift his arm above chest height without pain, he had identified two major life activities affected by his impairment. The court noted an impairment "need not prevent, or significantly or severely restrict the activity" in order to substantially affect a major life activity. Therefore, the court found an issue of fact as to whether the plaintiff had an actual disability."

B. Montana Silversmiths knew about Eaton's back injury and disability (Colette Dep14:14-22). Colette acknowledged that Eaton's recovery from his carpal tunnel surgery was taking longer than anticipated(Doc 105 pg. 69 with noted evidence Ex. Ex 9, Ex 16, Ex. 43--**PLTF 1613, Eaton Affidavit #72,Colette memo MTS 42&44; MTS 319-320)**

C. Eaton has a record of disability for his back and hands. Per ADAAA, though, regulation requirements do not require that an impairment last a particular length of time to be substantially limiting, Eaton can show that his impairments were longstanding and limiting to all major life functions, when these issues are affecting Eaton's back and hands, which are tantamount to working in any job function.

D. Montana Silversmiths took an employment action against Eaton because he had a disability, or a record of a disability . Montana Silversmiths would not allow Eaton back to work after Eaton initiated the interactive process, which is a requirement by ADAAA which requires communication and good-faith exploration of possible accommodations. Instead of Colette engaging in good faith exploration, she refuses to engage in this conversation, stopping Eaton, saying he needed to obtain a work release form.  She did not let Eaton know that Eaton's Work comp adjuster had contacted her via email on 5/11/17 (ATTACHED EXHIBIT 3-E) to let her know that the doctor said that he would let Eaton come back "If he can go back sooner, we will let him"

E. SIMILARLY SITUATED INDIVIDUAL: This includes a fellow employee of Eaton's.  Rick Waltner, who was also an engraver and had recently had a type of hand surgery within months of Eaton's. Rick had stated in his deposition that Colette told him he could come back whenever he was ready.  Additionally, Colette held back that she typically gets the medical release forms through/form work comp, as she had via a screenshot email for Rick Waltner( NEW EXHIBIT 7), who was told he could come back to work when he was ready (Doc 105 pg. 61 Ex. 6(Rick Deposition 30:24 through 31:9), not saying anything about a medical release form to him, showing disparate treatment. According to the United States Civil Rights Act of 1964, stating the similarly situated individuals that were not treated the same shows disparate impact.

F. FMLA entitlement and/or retaliation ties to the work comp. Being injured, Colette would not allow FMLA leave, which allowed them to lay me off while on work comp.*(Arban v. West Publishing Corp 345 F. 3d #90* (2003) Eaton may not have included FLMA entitlement as one of his counts because he thought FMLA was covered under ADA;  however, he would like to use this as a showing of pretext in his lay off as well as disability discrimination, which may include liquidated damages under the Fair Labor Standards Act (*Chandler V. Specialty Tires of AM 283 F3d 818, 827 (6th Cir. 2002).*

G. Montana Silversmiths  own Handbook stated that work comp will be designated at FMLA leave (Doc 105 Exhibit 25, MTS-191. pg 28).[15]MTS went against their own written policy in which they would not have been able to lay off Eaton if he was on FMLA leave.[16] (IN INTERLOCUTORY APPEAL DOC. 120)

**Issue/Argument Number 7**

What is the seventh argument in the answering brief to which you are replying?

**THE DISTRICT COURT PROPERLY GRANTED MONTANA SILVERSMITHS SUMMARY JUDGMENT ON EATON'S FEDERAL AGE DISCRIMINATION CLAIM.**

What is your reply to this argument?

---

[15] MCA 39-2-904 which include "The employer materially violated an express provision of its own written personnel policy prior to the discharge, and the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer."

[16] This deprivation goes against the new WDEA, which expressly states that 'the employer materially violated an express provision of its own written personnel policy in which the violation deprived the employee of a fair and reasonable opportunity to remain in a position of employment with the employer.

**4)AGE DISCRIMINATION**

Eaton Objects to findings of evidence against Eaton regarding Age discrimination.

ADEA 29 U.S.C §621-634 is the Age Discrimination in Employment Act, a primary federal law, which prohibits employers from discriminating against employees who are at least 40 years old based on age.

Eaton feels he was discriminated against based on his age secondary to the following (with associated evidence).

To make a prima facie case for age discrimination, Eaton must prove the following:

1. The employee, at the time of the act alleged to be discriminatory, is 40 or older. Eaton was age 43 when he was laid off.
2. THe employee is qualified for their job position; Eaton showed with a preponderance of evidence that he was qualified for their job position. (Doc 105 pg )
3. The employee experiences an adverse employment action (SDF #26,27, 41 ,46)

Andrew and Travis were half of Eaton's age and were both brought into the department to train. Eaton assisted both on various levels of metalsmithing[17]. Eaton only needs prove that he was either placed by substantially younger employees with equal or inferior qualification or discharged under circumstances otherwise giving rise to an inference of age discrimination (*Diaz v. Eagle, 521 F.3d 1201  2008*). When Travis began at Montana Silversmiths, he was in high school with no degree in Metalsmithing, like Eaton. AEM investigation  found Travis/Justin to have engaged in nepotism, Andrew being brought in, and Ami and Rick stating they (Montana Silversmiths) attempted again to bring a young man into the department to train in engraving and he didn't make it shows an inference of age discrimination. Justin Deacon[18] By his own account in his deposition, Travis was given more credit in design fabrication than even his own father gave, thus showing skills less then or at the level of Eaton's. Eaton was being demoted[19] as Travis was allowed the Training needed to increase skill sets and adding to the cross training matrix[20].

An inference of discrimination can be established by showing the employer had a continuing need for [the employees] skills and services in that their various duties were still be performed .. or by showing that others not in their protected class were being treated favorably (*Diaz v. Eagle, 2008*). Eaton showed that Travis was provided opportunities that Eaton was not with trips[21], training[22]. Additionally, Eaton was needed, noted in the amount of overtime[23] used after Eaton's lay off as well as MTS attempting to hire someone after his lay off (Doc 105 pg. 83), but the young man didn't show a good skill set like Eaton. The above coupled with Eaton's statistical analysis (Doc 113, pg34), form a prima face case for age discrimination. (IN INTERLOCUTORY APPEAL DOC. 120)

**Issue/Argument Number 8**

What is the eighth argument in the answering brief to which you are replying?

**THE DISTRICT COURT CORRECTLY DENIED EATON'S OBJECTION TO THE FIRST SUMMARY JUDGMENT ORDER BECAUSE IT WAS ISSUED BY THE ARTICLE III JUDGE FOR THE DISTRICTOF MONTANA AND NOT THE U.S. MAGISTRATE JUDGE.**

What is your reply to this?

---

[17] Eaton assisted in teaching Andrew and Travis how to saw and engrave.

[18] Doc 105 Ex. 5 Justin Dep. 17:19-2 (Doc 103 pg 16)

[19] Justin saying this is all I have to give my son, I want to make this a family business, it is like cutting me and my son's throat (Eaton affidavit and Jusitn's AEM investigation)

[20] Matrix is invalid

[21] Rick Waltner's Deposition 29:8-11; Curt Robbins Deposition 32:2-22

[22] Doc 105 Ex. 5 (Justin Dep 17:25; 18:1-4)

[23] Doc 105 pg 75-78- All overtime of engravers was tripled or quadrupled after Eaton's lay off.. Travis's overtime increased from 70.03 before Eaton's Lay off to 140.03 after Eaton's lay off.

According to Federal Rules of Civil Procedure Title VII Judgment Rule 60(b) - Relief from a Judgment, order, or proceeding on Motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for 1) Mistake, inadvertence, surprise, or excusable neglect; 2)Newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)[24]; 3) Fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (Jessica Fehr misrepresentation of facts in MHRB investigation stating Eaton said he was bringing a gun- when looking at depositions of Justin Deacon regarding this 'gun' comment, and Colette Schlehuber about the 'gun' comment, this was inaccurate- on top of this during Lance Neirby's Deposition, he also stated that the 'gun' comment was inaccurate- HOWEVER, when counsel requested a break and consulted with Lance, when Adam Warren asked AGAIN, Lance said 'it could have been a gun' thus showing misrepresentation of counsel and that this act was purposeful to keep this statement in the records. isn't the The judgment then void? Especially with the amount of clerical errors noted by Eaton in putting in the evidence, so that the Judge may not have known it was there- this goes for both summary judgments.

Additionally, The Court made a mistake with the labeling of Document 113. Within the document, Eaton had inadvertently erased portions of his responses in Doc. 103, 104, 105. Therefore, in Document 114 and 114-1, Eaton showed clarifications to this and additional evidence;however was not allotted the opportunity to clarify his mistake- however, the court clarified their clerical error and allowed the opposition the opportunity to clarify their error of a lack of response as well, without allowing EAton the opportunity to provide additional documentation and clarification to his errors in his summary judgment documents. Thus, given the excessive errors during summary judgment by all parties, the summary judgment should be invalidated/ Eaton should be relieved from the final judgment/order and neither summary judgments should be granted. Eaton should have either been allowed a request for reconsideration and/or more thorough review of interlocutory appeal.

### Issue/Argument Number 9

What is the ninth argument in the answering brief to which you are replying?

**THE DISTRICT COURT PROPERLY GRANTED MONTANA SILVERSMITHS LEAVE TO FILE A SECOND MOTION FOR SUMMARY JUDGMENT**

What is your reply to this argument?

In Document 132, the Judge states, "Furthermore, the response contains several unhelpful parentheticals and is at least half devoted to attempting to have the Court reconsider previously dismissed claims. This is wholly inappropriate." If the Court were to read Eaton's Defense to the Defendant's request to file a second summary judgment (Doc. 129), they would be able to see that Eaton, in fact, did not bring up any of his previously dismissed claims at this time, instead, he stated, "Under the Federal Rules, a summary judgment motion can be made at any time until 30 days after close of fact discovery (Fed. R. Civ. P 56(b)). The Defendant's have done this and now, over one year after their first summary judgment request (12/3/20), they want another without showing of excusable neglect under the Pioneer factors, which allows the trial court to refuse to hear a motion for summary judgment filed after the deadline ( *see Rosario-Diaz v. Gonzalez,* 140 F.3d at 313 1st Cir. 1998)

---

[24] EATON FOUND NEW EVIDENCE THAT MONTANA SILVERSMITHS WAS HIRING IN MANUFACTURING ON THEIR FACEBOOK PAGE IN JANUARY, 2017 MONTHS BEFORE HIS LAYOFF.(Doc. 142 at pg 160) - please note, the attachments to Eaton's second summary judgment response were NOT scanned in separate, they are at the end of the document that was scanned in on Doc. 142.

and if allowed should be reviewed for abuse of discretion (*Rosario-Diaz v. Gonzalez,* 140 F.3d at 313). The Pioneer factors are as follows and include:

1. Danger of Prejudice (the amount of times the Defendant's had and extended response times to add this is exceptional to most cases, they had more than 5 goes at it. At this point there would be an exceptional prejudice to the Civil rights of Eaton if this were to go through)

2. The length of delay and its potential impact on judicial proceedings (Any more extensions to allow another defense could potentially prolong this case even further than it has been)

3. The reason for the delay, including whether it was within the reasonable control of the movant (The movant has had a summary judgment, there is not constitutional reason to allow more than his 4-5 tries to throw retaliation out)

4. Whether the movant acted in good faith.(this does not look like a good faith effort, especially following a phone call to Eaton, the plaintiff asking him to revoke and have Eaton's own case thrown out)

In this case, the defendant's negligence does not constitute "excusable neglect" under other statutory and case law.

   Additionally, in (Dkt. 7 at 29- of this appeals case) Montana Silversmiths states "based on undisputed facts presented by Montana Silversmiths, which Eaton could not rebut with evidence beyond his own self-serving claims." However, Eaton's admissible evidence with, according to Judge Susan P. Watters in Document 113, page 23 "Given the light burden required to overcome Montana Silversmiths' motion for summary judgment , the evidence is sufficient to create an issue of fact for trial as to causation". Additionally, in Document 113 page 28, it is stated " Here, Eaton's claim that he was terminated in retaliation for reporting sexual harassment and racial discrimination fall squarely within Title VII's antiretaliation provision", indicates a noteworthy association between retaliation and termination. Eaton has been very clear about his low marks on his performance evaluations since day one, in his summary judgment response, the following was very clear **"Lower marks on performance evaluation** Lance Neirby forced Justin Deacon-- to downgrade Eaton's performance Evaluation. (Interrogatory 129 and 130; SDF #52, 53, & 109). Lance Neirby changed the phrase of Eaton "not getting along with Travis Deacon, to not getting along with Justin Deacon" after Eaton stated he was not given a warning, even though Justin and Eaton reported they were getting along fine until the current meeting (April 4th meeting). Lance kept the scores low." (Doc. 103 at 21). Judge Watters addressed Eaton's performance evaluation in her Order (Doc. 113) allowing retaliation to stick.

Additionally, according to FRCP 56, the scheduling order cannot be changed except for good cause.  Additionally, their neglect in responding to the performance evaluation and defending this, which they were allowed in their response to Eaton's defense in summary judgment as well as with all requests for dismissal and summary judgements, does not provide sufficient "good cause" for another summary judgment. They had completed summary judgment and all the evidence was in their possession to review. They do not have newly discovered evidence, which would allow for "good cause"; this is a request almost a year after discovery ended and all motions were to be put in, , thus there is no sufficient justification for this action.

A great many courts have affirmed that where performance improvement plans and negative performance reviews precede an eventual termination, they may constitute adverse actions. *See, e.g., Winston v. Verizon Servs. Corp.,* 633 F.Supp.2d 42, 51 (S.D.N.Y. 2009); *see also McBroom v. Barnes & Noble Booksellers, In*c., 747 F.Supp.2d 906, (N.D. Ohio 2010) (citing cases and finding "evidence in the record that the negative appraisals and performance plans supplied the necessary foundation for Plaintiff's eventual separation" sufficient to constitute adverse actions).

"An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 337 (4th Cir. 2011) (internal quotation marks omitted).

Typically, a "poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment. An evaluation merely causing a loss of prestige or status is not actionable." *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 377 (4th Cir. 2004) (citations and internal quotation marks omitted).[25]

When a pattern of discriminatory conduct is alleged, specific individual acts should be viewed as a whole, rather than as isolated incidents. *See, Ross v. Douglas Cnty.,* 234 F.3d 391, 397 (8th Cir. 2000). Discriminatory actions should not be viewed individually, with each act itself required to constitute an "adverse employment action," but rather the court should determine whether the actions, viewed as a whole, are discriminatory and connected to one another. *Kim v. Nash Finch Co.,* 123 F.3d 1046 (8th Cir. 1998). State and federal courts recognize that "adverse employment actions" include actions short of those causing economic disadvantage. The United States Supreme Court has recognized that "adverse actions" are not limited to those actions which are economic or tangible. *See, Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998). Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule " if it cannot reasonably be met despite the diligence of the party seeking the extension,\." Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modifications. If that party was not diligent, the inquiry should end." *Johnson v. Mammoth Recreations,* Inc.975. F.2d 604, 609 (9th Circuit 1992)(citations omitted). This is a commonly applied citation.

Eaton's performance evaluation has been disputed form the beginning in the AEM investigation, in MHRB investigation, questions is the deposition, and in the fourth amended complaint. I can't see diligence, only incompetence, negligence of response, if the shoe was on the other foot (i.e., pro se plaintiff) I would not get another stab at it. This should be looked at in the light most favorable to the non-moving party. The main document that is typically looked at in a retaliation/discrimination case is the performance evaluation, so it does not seem appropriate that a certified law firm would not be educated enough to review and defend this in the many times they have been allowed thus far. Judge Watters discussed this in an extended section in Document 113, there should be no excuse for the lawyers to not have already addressed this. Additionally, Eaton stated, "If this is allowed, then I should be able to Object or Obtain a Reconsideration on the confusing Document 113 Magistrate Judge and order on all claims." which he was not allowed any of.

### Issue/Argument Number 10

What is the tenth argument in the answering brief to which you are replying?

**THE DISTRICT COURT DID NOT ERR IN GRANTING MONTANA SILVERSMITHS' SECOND MOTION FOR SUMMARY JUDGMENT.**

What is your reply to this argument?

Eaton disagrees that Montana Silversmiths was justified in altering the comments, secondary to Justin Deacon reporting that these comments were not ones that he wanted on the performance evaluation initially, they were comments that Lance

---

[25] Note that in Eaton's count for retaliation his performance evaluation was in the criteria of selection for employees to be laid off.(ATTACHED **EXHIBIT 1-Y**)

Neirby had wanted on the performance evaluation. Additionally, the comments were changed after the performance evaluation was completed and had nothing to do with Eaton's performance evaluation, but had to do with Lance forcing Eaton to bring up Eaton's concerns with sexual/racial harassment to his direct supervisor AFTER Eaton's performance evaluation had been completed. Therefore, none of these comments had anything to do with the performance evaluation that was completed the day before (April 4th, 2017-ATTACHED **EXHIBIT 1-B**).- inaccurately because that is what Lance wanted. Eaton reviews this information in grave detail in his Summary Judgment #1 and second Summary Judgment responses with his Statement of Disputed facts. An excerpt included, "Justin stated in the MHRB investigation that he did not think Eaton's reaction was inappropriate with regard to the performance evaluation meeting(s) (Doc. 105-10 at 7 ¶1) and Deacon stated that Deacon and Eaton got along well and that Eaton always had gotten along with all the employees-he is always in good spirits and is easy to get along with."(Doc. 105-10 at 34;PLTF 1726-1727 ATTACHED **EXHIBIT 4-B**).coming along very nicely, he is always in good spirits and is easy to get along with."(Doc. 105-10 at 34;PLTF 1726-1727)".

*Passantino v. Johnson & Johnson Consumer Prod.*, Inc., 2121 F. 3d 493, 507 (9th Cir. 2000) (noting that causation can be inferred from timing alone); *Miller v. Fairchild Indus.* 885 F.2d 498, 505 (9th Cir. 1989)(stating that a prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearing ); *Yartzoff v. Thomas*, 809 F. 2d 1371, 1376 (9th Cir. 1987)(stating that sufficient evidence existed where adverse actions occurred less than three months after complaint was filed, two weeks after charge was first investigated, and less than two months after investigation ended).

### A. Retaliation

Eaton contends that Montana Silversmiths retaliated against him by downgrading Eaton's 2017 performance evaluation significantly without warning or warrant, directly after Eaton, following the employee handbook, reasserted his ongoing concerns of sexual harassment and racial discrimination. These concerns were initiated in July and August, 2015 to HR, and were never addressed. Colette never exercised reasonable care in preventing and correcting the sexual harassment conduct in 2015 (*Faragher v. City Boca Rato*n (1998) Faragher-Ellerth defense. HR never investigated Eaton's complaints in 2015, never spoke to Justin Deacon (Eaton's direct supervisor, which the complaints were regarding), even though Colette Schlehuber said she would. Eaton reasserted these claims several times throughout 18 months following (All within the statute of limitations). The most recent meetings regarding Eaton's concerns of sexual/racial harassment were conducted directly before, during, and after his 2017 performance evaluation, specifically initiated on April 4th, 2014 with noted direct degradation of Eaton's performance marks, constituting direct retaliation. Robert obtained an overall Rating of 3.48 on his 2016 performance evaluation with 12 'excellent' ratings as opposed to 2.7 with 1 excellent rating on his 2017 performance evaluation.

### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

Eaton's case holds a claim of retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000(e)-3. Section 2000e-3(a) makes it unlawful to discriminate against an individual who has (1)- opposition clause stating "opposed any practice made an unlawful employment practice by this subchapter" or (2)-participation clause stating "...made a charge.. Or participated… in an investigation, proceeding, or hearing under this subchapter: *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009). Under Title VII's "anti retaliation" provision, Eaton holds a claim of retaliation (*See also Thompson v. N. Am. Stainless*, LP, 562 U.S. 170, 173-174 (2011)).

Eaton can show a *prima facie* case for retaliation, by demonstrating that; 1) he engaged in a protected activity; 2) he was subsequently subjected to adverse action; 3) a causal connection link exists between the protected activity and the adverse action. *Rolison v. Bozeman Deaconess Health Services,* 2005 MT 955, ¶ 17, 326 Mont. 491, ¶ 17, 111 P.3d 202, ¶ 17.

## PRETEXT

Eaton can show pretext via having his performance evaluations downgraded directly after complaints of sexual/racial harassment, and being sent home directly after the final meeting where he was forced to confront his direct supervisor about his concerns. Evidence of pretext can include negative treatment that occurred after the employee engaged in activity protected under the law, such as filing a charge, participating in an Investigation. In *Xin Liu v. Amway Corp.,* 347 F.3d 1125, 1132, n.4. (9th Cir. 2003). Additionally, be aware of suddenly placing an employee under a microscope. As a Federal Appellate Court noted, *Burton v. Freescale Semiconductor, Inc.*798 F.3d 222 (5th Cir. 2015), 14-50944, "Evidence of sudden unprecedented campaign to document [an employee's] deficiencies and thus justify a decision that had been already made, could raise an inference of pretext." Eaton was placed under a microscope, having two comments and sections of his performance evaluation of 2017 being significantly downgraded from years prior. When Eaton relayed this to his VP, then the VP forced Eaton to tell his direct supervisor of his allegations of sexual/racial harassment/discrimination, took one of the two unwarranted degraded marks, and made this a direct conflict between supervisor and employee with reference to Eaton "Sidestepping proper reporting" and "not getting along with supervisor" both comments directly attacking Eaton's reporting of sexual/racial discrimination/harassment to upper management and Justin's response to Eaton's allegations.

Montana Silversmiths had violated the express provisions of its own written personnel policy, which was found in the third party investigation in reference to nepotism, as well as Eaton reporting to HR instead of his Direct supervisor, which the handbook states is appropriate, yet Eaton was reprimanded for. Additionally, two supervisors stated in the AEM investigation that they wanted Eaton gone.
 Montana is the only At will State, in which an employer cannot just lay off an employee for no apparent reason, there must be a legitimate business reason.  Eaton can prove that there was no legitimate reason to lay him off specifically, because there is continuous need for designer/engravers in his department

## Courts Rulings

The Court Already found in Eaton's Case that there is a genuine issue for trial. There is evidence that supports material facts (Doc. 113 at 18-23)-1)Eaton showed the Court that he was a qualified employee; 2)was in a protective class;  and 3) there is a causal connection in time "very close" of Eaton reporting sexual/racial harassment, and being retaliated against. The Court already ruled on Eaton meeting the 3 stage criteria for prima facie case for retaliation with respect to his performance evaluation (Doc. 113 at 22), stating that the Court interpreted the anti retaliation provisions "more broadly" - referencing Title VII in *Burlington Northern Santa Fe Ry. Co. v White,* 548 U.S. 53 (2006). The Court also ruled on the downgraded and written remarks being changed on the performance evaluations as being a material fact because of the timing of the sexual harassment and racial discrimination claims were within the same date/time, stating,
 *".. But the 2017 evaluation was conducted at the same time as Eaton's report of sexual harassment to Neirby on April 4, 2017. In fact, Nearby made changes to the evaluation after the meeting with Eaton on April 4th, 2017 to allege that Eaton had a "challenging relationship" with his direct supervisor[referencing Doc. 96-3 at 9]. Given the light burden required to overcome Montana Silversmiths' motion for summary judgment, the evidence is sufficient to create an issue of fact for trial as to causation"*(Doc. 113 at 23).

## Tangible Consequences

In reference to the employment labor law, tangible consequences are referred to as "employment action is any action causing a significant change in your employment status. This includes, but is not limited to, hiring, firing".(employment labor law.com). Because the Layoff plan referred to in Eaton's 2017 layoff listed 5 areas that were used in the layoff, and the performance evaluations of 4/1/17 were listed in order as the second most weighted document to determine layoff, Then Eaton's tangible consequences were 1) downgraded marks on his performance evaluation put in permanent file, to 2) Lay Eaton off.  It should be noted that , "An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner*, LLC, 650 F3d 321, 337 (4th Cir. 2011( internal quotation marks omitted). Eaton's performance evaluation Marks were downgraded, noted to be incorrect, changed to a new performance record, which was again downgraded with new remarks which were not valid at the time of the original performance evaluation.[26]Lance was in charge of performance evaluations leading to layoff, so this was a definite pretext, showing retaliation for reporting public policy violations ( MTS 1176 ATTACHED **EXHIBIT 1-Y**).

The totality of the circumstances shows retaliation for claims brought forth by Mr. Eaton. The performance evaluation impaired Eaton's ability to be promoted at all, to receive any type of advancements (To a Master engraver, where Eaton could have been paid double), pay raises. Justin said Eaton could have done Master engraving which would have yielded higher pay. There was no documentation of any flaws with Eaton's interaction with co-workers or sidestepping until Eaton's performance evaluation.  Just as in  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132, n.4. (9th Cir. 2003),

1. Eaton was cross-trained well and could have done Master buckles, the highest level of engraving, higher than any other engraver to date
2. Eaton was of good character (Eaton's 2016 performance) evaluation states, "Always in good spirits"
3. Eaton had no disciplinary actions, and no verbal warnings, and had good performance evaluations scoring the highest you could get on "interaction with co-workers" in 2016, the year before they dropped this very area to the worst level in 2017.
4. The two changes/degraded marks to Eaton's performance evaluation of 2017 degraded from 2016 performance evaluation were unwarranted . Eaton was SENT HOME WITH NO DISCIPLINARY ACTION, WARNING SHEET, ETC. directly after Eaton was forced by VP, Lance Neirby, to bring up his concerns of sexual/racial harassment/discrimination to his direct supervisor, Justin Deacon. During the April 5th am meeting. Supervisor's should be held at a higher standard *Vance v. Ball State University*, 646 F. 3d 461 (7th Cir. 2011); *Martinez v. Cracker Barrel Old Country Store*, Inc., f2-13, U.C. App. Lexis 594 (6th Cir. Jan. 10th 2013).
5. There was no legitimate business reason/judgment to downgrade Eaton's performance evaluation, except to throw him into the layoff.)

Thus, according to *Crawford, 555 U.S. at 276* (Cited from Doc. 113 at 19) ("When an employee communicated to her employer a belief that the employer has engaged in….. A form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity")- The Court has already agreed Eaton's raising of his concerns to Montana Silversmiths HR and VP fall under protected activities.  Especially since Eaton had also spoke about getting a lawyer and calling the EEO in his meeting with Lance on April 4th, 2017 and Colette on April 5th, 2017. See *Reeves v. Sanderson Plumbing* (2000) 530 U.S. 133, 147, 120 S.Ct. 2097 where "Proving the employer's reason false becomes part of the greater enterprise of proving that the real reason was intentional discrimination". *Yanowitz v. L'Oreal USA, Inc.*(2005) 36 Cal.4th 1028 [32 Cal.Rptr.3d 436] "liberalized the test for determining what level of adverse action was

---

[26] Eaton got along well with Justin Deacon before Lance made Eaton confront Deacon about his sexual harassment/racial discrimination claims on April 5th, 2017 (Doc. 104 at 28)

sufficient to support a retaliation claim. In the process, it also stressed that real-world considerations were controlling. In particular, *Yanowitz* held that courts "need not ... decide whether each alleged retaliatory act constitutes an adverse employment action in and of itself," but instead must evaluate whether the "totality of the circumstances "of a "pattern of systematic retaliation" (*Id.* at 1055-1056.)". Thus, in looking at the totality of the case, it shows continual retaliation of Eaton for reporting violations in public policy with ongoing degradations, ending in downgrade performance evaluations, low-balling Eaton's cross-training, and ultimately laying Eaton off when in fact, his skills uphold the constant needs and backbone of the Montana Silversmiths company. The defendants initially in this case, tried to steer away from using the Performance evaluations as Criteria for the layoff and put more emphasis on Cross training. The cross training Matrix was inaccurate because Justin, the supervisor to the engraving department and only one who had the expertise to fill out the Cross training matrix and update it, did not update it. Justin said this himself, thus it was invalid.

Finally, Eaton has admissible evidence that shows that Montana Silversmiths needed designer/engravers in the very department Eaton worked, which are difficult to find. In fact, there is direct evidence showing they were planning on hiring and looking for engravers for Eaton's position, planning on hiring in July, just weeks after they laid Eaton off. Thus, they did not have any legitimate business reason to lay Eaton off, specifically.

## C. Direct Evidence vs. Indirect Evidence of Discrimination

The plaintiff has established a prima facie case of unlawful discrimination with direct evidence, the employer must prove by a preponderance of the evidence, that an unlawful motive played no role in the challenged action or that the direct evidence of discrimination is not credible and is unworthy of belief.: *Reeves v. Dairy Queen*, Inc., 1998 MT 13, ¶ 19, 287 Mont. 196, 953 P. 2d 703; A.R.M. 24.9.610. In *St. Mary's Honor Ctr. v. Hicks* - 509 U.S. 502, 113 S. Ct. 2742 (1993), under the McDonald Douglas scheme, if profers that a plaintiff must introduce evidence from which a reasonable person could infer casts of doubt on the defendant's contention that there was a legitimate business justification for its actions *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Eaton contends that being given a 4 for reporting to HR about his supervisor's conduct of sexual harassment/racial discrimination, which was in line with following the Employee handbook[27] were undeserved, which was supported by the fact that Justin Deacon, himself stated he and Eaton always got along (Justin Deposition at 29:18-25 and MTS 292) .[28] In addition, the Court may choose to employ the McDonnell Douglas burden-shifting test used in discrimination cases based on circumstantial evidence. Pursuant to the burden-shifting test, the Charging Party must establish a prima facie case of unlawful discrimination Eaton proved he was in protected class/engaged in a protected activity;that he was was qualified for an employment and that he was denied the opportunity, or otherwise subjected to adverse action by respondent in circumstances raising a reasonable inference that charging party was treated differently because of membership in a protected class or because of protected activity." Admin. lR. Mont. 24.9.610. If, Montana Silversmiths "produce evidence of a legitimate, nondiscriminatory reason for the challenged action," Admin. R. Mont. 24.9.610. HOWEVER Eaton is able to demonstrate that the reason offered by the respondent is a pretext for unlawful discrimination or illegal retaliation. The charging party can prove pretext with

---

[27] Please note that this is with regards to the second '4' rating on Eaton's Performance Evaluation, which states "Sidesteps proper reporting of concerns outside management hierarchy"( PLTF 1730)which should not have been low, because the only time Eaton did this was when he was complaining of sexual/racial harassment as noted in Collette's Documents in 2015 ( MTS 46) and Eaton's Affidavit (Doc. 103-1 at # 30,39, 40-43,53-54, 61-62) AND according to the employee handbook, he could report issues of harassment to anyone in upper management ( MTS 168)

[28] (Doc 105-9 at 3 #9; MTS 292)– *Generally, how is your working relationship with Robert Eaton?*
    *A: I honestly thought he and I got along pretty well. We have a lot of stuff in common---*\*\*\*\*\*\*\*\*\*

evidence that the respondent's acts were more likely based on an unlawful motive or indirectly with evidence that the explanation for the challenged action is not credible and is unworthy of belief. Admin. R. Mont. 24.9.610.

**Issue/Argument Number 11**
What is the eleventh argument in the answering brief to which you are replying?
**THE DISTRICT COURT DID NOT ERR REGARDING EATON'S ALLEGATION OF DEFAMATION BY THE FORMER COUNSEL FOR MONTANA SILVERSMITHS BECAUSE EATON NEVER RAISED SUCH A CLAIM WITH THE DISTRICT COURT.**

What is your reply to this argument? Eaton brought up this issue in the Pretrial Statement Doc. 39, in the Statement of Disputed Facts, Doc. 105, and Second Statement of Disputed Facts, Doc. 142). Eaton was not sure how he could directly raise a claim like this at the District Court level with all the Judges within the state working together. Jessica Fehr is a former Lawyer of Montana Silversmiths and currently works as a Judge in the State of Montana. Eaton did raise his concern with the issue at the beginning in the Pretrial Conference, and no one responded to his concerns. Additionally, Eaton attempted to bring this issue to the alternate counsel's attention, to which they would not respond. However, ultimately, Eaton decided to make sure he had a defense to this issue during Depositions, at which time, he asked all parties who would have known, Justin Deacon, and Lance Neirby- even Colette Schleuber, whom had been privy to discussions of the April 5th, 2017 meeting- about the mention of the word 'gun'.

To summarize, in Eaton's Pretrial statement (Doc. 39), page #13, with reference to Eaton's defamation case, Eaton stated, "Lance Neirby Thursday, April 13, 2017 6:16 am email to Colette Schleuber and Peter Eckberg *"Everyone thinks I am going to go postal and bring a bomb" followed by I have a lot of thinking to do and something like "I won't bring in a bomb and I have talked to a lawyer".* Montana Silversmith's council brought this up in their MHRB answer , stating, "Mr. Eaton is quoted as saying, "Everyone thinks I am going to go postal and bring a bomb". (Doc. 105- Montana Silversmiths counsel changed this response in their Answer to Amended complaint in the MHRB to stating that Mr. Eaton was quoted saying, " It's not like I would bring a gun to work, or go postal".

Montana Silversmiths had changed this phrase at least 3 times between themselves. Eaton emphasizes that it should be noted that this accusation was brought up 3 days after Eaton hand delivered his grievance to HR, showing that their reason for bringing this up was to use it to attempt to demoralize his character and rationalize sending him home after the meeting on April 5th, and the email on April 13th was an attempt to document their efforts."

Next, During Depositions, Eaton asked Justin Deacon *(Doc. 96-21 pg 52-53;)*, Justin stated that Eaton did not say the word, "gun", Lance stated, "you said bomb" *(Lance Deposition Doc. 96-20 at 76:17-23)*. However, it should be noted,
(**Lance DepositionDoc. 96-20 at 121:11-15)***(Q:EATON) Was the bomb comment taken out of context?*
    a. *WARREN: OBJECTION, ARGUMENTATIVE, DON'T ANSWER*
Additionally, AFTER MTS counsel requested a break and met with Lance behind closed doors-In Montana Silversmiths Counsel's Cross Examination of Lance Neirby (Doc. 96-20 at 137:10-138:2)- they appeared to coerce Lance into Saying it It could have been a gun(After Lance was adamant that the comment was NOT bomb)
Again, Lance never said 'gun' before. Now in Eaton's cross examination of Lance and no-one corroborated Lances comment of "going postal": **(Lance Deposition Doc. 96-20 at 141:23-144:12)**, Lance attempted to say Collette said ,"gun" not knowing that the comment EAton's was referring to was Montana Silversmiths counsel, not Colette.
Please Note Counsel, Adam Warren's Objection to this during Depositions, as well as preparing the witness to say something that he most adamantly stated was not true after briefing him during the break- . Doesn't this raise a question

of Deposition Misconduct by the Counse Fed R. Civ P 30?[29] Having reviewed all of the Admissions, Depositions, and Excerpts of the day of the April 5th meeting, this shows that there was significant misconduct of Counsel to coerce their client to make misstatements about the plaintiff. No gun or bomb comment was documented in the police report (Doc. 105-12 at 3).

**Issue/Argument Number 12**

What is the twelfth argument in the answering brief to which you are replying?

**THE DISTRICT COURT JUDGE DID NOT ERR IN FAILING TO RECUSE HERSELF "DUE TO PRO SE LITIGANT BIAS" BECAUSE EATON NEVER RAISED SUCH AN ISSUE WITH THE DISTRICT COURT, AND HE HAS FAILED TO PROVIDE EVIDENCE WHATSOEVER TO SUPPORT HIS CLAIM.**

What is your reply to this argument?

Plaintiff, Robert Eaton, respectfully requests the recusal of Judge, Susan Watters, per Judicial Code 28 U.S.C. The Supreme Court held in 1994 that "Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified." [Emphasis added] *Liteky v. U.S.*, 114 S. Ct. 1147, 1162 (1994). Eaton's case involves Judge Watters, since being reassigned to Eaton's case on 9/20/21 as follows:

1) Denied Eaton's request for hearing (Request is Doc. 109); (Denial within Doc 133). Denied all requests for Eaton following request for hearing. Denied Interlocutory appeal with less than 1 page rationale.

2) Allowed Defendant's a Second Summary Judgment, allowing summary judgment a second time, even though she had already ruled on the Merits of retaliation in Eaton's case. Stating that she had not ruled on the Merits and that the first summary judgment was confusing (which she had denied a hearing to clarify any questions stating "The Court has thoroughly reviewed the parties' submission on the summary judgment motion and has determined that it would not benefit from oral argument (Doc. 113 at 42)")and denying Eaton's defense stating Citation issues, (i.e., technicalities) and that Eaton is just trying to reassert his other claims, which Eaton had done on the interlocutory appeal, but NOT the "Reply response to Defendant's request for leave to file second summary judgment"(Doc. 130). Eaton had written several citations correctly and provided adequate rationale, which Judge Watters did not even address.

Judge Watters continuously presented Eaton with off set rationale and used technicalities to deny all of his Motions, however, when the Defendant's Lawyers forgot to follow, for example, L.R. 7.1(Doc. 115 and response noting Doc. 116) to contact Eaton prior to putting in a motion, she will ignore their error and is holding Eaton to a higher standard *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1959); *Picking v. Pennsylvania* R. Co., 151 Fed 2nd 240; Pucket v. Cox, 456 2nd 233. Pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same high standards of perfection as lawyers. Thus, because Eaton is a non-represented litigant, and the court should be

---

[29] Lawyers must conduct the examination and cross-examination of a deponent in the same manner, and with the same level of decorum, "as they would at trial." Fed. R. Civ. P. 30(c)(1). Objections "must be stated concisely in a non argumentative and non suggestive manner," and a witness may be instructed not to answer "only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2)(emphasis added). Rule 30(d)(2) states that the "court may impose an appropriate sanction – including the reasonable expenses and attorney's fees incurred by any party – on a person who impedes, delays or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). Thus, sanctions may be imposed for "argumentative objections, suggestive objections, and directions to a deponent not to answer…[A]n excessive number of objections may constitute actionable conduct, though the objections be not argumentative or suggestive." *Craig v. St. Anthony's Medical Center*, 384 F. App'x. 531, 533 (8th Cir. 2010)(paraphrasing the Advisory Committee's comments to Rule 30(d)(2)).

following the law as to non-represented litigants, but she is not, showing an "appearance of partiality", and under the law, it would seem that she has disqualified herself.

Should a judge not disqualify him/herself, then the judge is in violation of the Due Process Clause of the U.S. Constitution. *United States v. Scuito,* 521 F. 2d 842, 845 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause").  The Plaintiff respectfully requests this action.

Name
_Robert Eaton_
_113 Moose track drive_
_Roberts MT. 59070_
Address

Signature _____

Date _1/16/23_

CERTIFICATE OF SERVICE

Certificate of Service

I hereby certify that on the 16TH th day of January, 2023, a 2 copies (1 set of exhibits) of the APPEAL INFORMAL REPLY BRIEF was served on the following persons by the following means:

_____X___MAIL

(6 copies served to-2 sets of exhibits)

Moulton Bellingham, PC                    U.S. Court of Appeals for the

27 North Street, Suite 1900               Ninth Circuit

P.O. Box 2559                             P.O. Box 193939

Billings, Montana 59103-2559             San Francisco, CA   94119-3939

Telephone: (406)248-7731

FAX: 406-248-7889

ROBERT EATON, PRO SE